**SOUTHWEST AIRLINES CO., Plaintiff,
Texas Aeronautics Commission,
Intervenor,**

v.

**TEXAS INTERNATIONAL AIRLINES,
INC., et al.**

**No. CA 3–75–0340–C.**

United States District Court,
N. D. Texas,
Dallas Division.

June 5, 1975.

John L. Hauer, Clarice M. Davis and William Michael Byrd, Jr., Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., and Herbert D. Kelleher and Gary A. Barron, Oppenheimer, Rosenberg, Kelleher & Wheatley, Inc., San Antonio, Tex., for Southwest Airlines Co.

John L. Hill, Atty. Gen., David M. Kendall, First Asst. Atty. Gen., Rex H. White, Jr., Asst. Atty. Gen., Austin, Tex., for Texas Aeronautics Commission.

Sam Coats, Vice Pres. & Gen. Counsel, Houston, Tex., and George W. Bramblett, Jr., Haynes & Boone, Dallas, Tex., and Phillip Robinson, Robinson, Felts, Starnes & Wilson, Austin, Tex., for Texas International Airlines, Inc.

Eugene Jericho, Strasburger, Price, Kelton, Martin & Unis, Dallas, Tex., and Jerry C. Prestridge and Donald S. Thomas, Clark, Thomas, Denius, Winters & Shapiro, Austin, Tex., and Robert S. Harkey, Law Dept., Delta Air Lines, Inc., Atlanta, Ga., for Delta Air Lines, Inc.

R. A. Lempert and H. Wayne Wile, Asst. Gen. Counsel, American Airlines, Inc., New York City, for American Airlines, Inc.

David N. Brictson, Frontier Airlines, Inc., Denver, Colo., for Frontier Airlines, Inc.

Thom G. Field, Neale, Newman, Bradshaw & Freeman, Springfield, Mo., for Ozark Air Lines, Inc.

W. Glen Harlan, Eastern Air Lines, Inc., New York City, for Eastern Air Lines, Inc.

W. B. West, III, Clark, West, Keller, Sanders & Butler, Dallas, Tex., for Braniff Airways, Inc.

G. Edward Cotter, Sr. Vice Pres. and Gen. Counsel, Continental Air Lines, Inc., Los Angeles, Cal., and Joe M. Kilgore and James W. Wilson, McGinnis, Lochridge & Kilgore, Austin, Tex., for Continental Air Lines, Inc.

S. G. Johndroe, Jr., City Atty., and Ogden K. Shannon, Fort Worth, Tex., for City of Fort Worth, Tex.

N. Alex Bickley, City Atty., Dallas, Tex., for City of Dallas, Tex.

Charles C. Wells and C. Merrill Bierfeld, Dallas-Ft. Worth Regional Airport Bd., Dallas-Fort Worth, Tex., for Dallas-Fort Worth Regional Airport Bd.

## OPINION

WILLIAM M. TAYLOR, Chief Judge.

Plaintiff Southwest Airlines Co. (Southwest) applies to this court to enjoin defendants from undertaking to relitigate in a suit pending in a state district court of Travis County, Texas, certain rights and public duties previously litigated and determined by this court. The defendants are Texas International Airlines, Inc. (Texas International or T.I.); Delta Air Lines, Inc. (Delta); American Airlines, Inc. (American); Braniff Airways, Inc. (Braniff); Ozark Air Lines, Inc. (Ozark); Frontier Airlines, Inc. (Frontier); Continental Air Lines, Inc. (Continental); Eastern Air Lines, Inc. (Eastern), which airline defendants are sometimes hereinafter collectively referred to as CAB carriers or "signatory airlines", and the City of Fort Worth, Texas (Fort Worth); City of Dallas, Texas (Dallas), and Dallas-Fort Worth Regional Airport Board (Airport Board). Texas Aeronautics Commission (TAC) has intervened as a plaintiff.

On March 21, 1975, this court, on sworn allegation that defendants intended to rush to trial and judgment in the Austin suit, restrained and enjoined defendants from prosecuting that portion of the state court suit pending in Austin, Texas, which attempted to exclude Southwest Airlines from Love Field while Love Field remains open and from otherwise directly or indirectly interfering with the judgment of this court rendered on May 11, 1973. Plaintiff's application for preliminary injunction pending final trial was heard on April 3, 1975, with notice to and appearance by the defendants. By letter dated May 15, 1975, the court advised all counsel of record that pending final trial defendants would be enjoined "from relitigating in state court issues which had previously been litigated, determined and adjudicated by this court affecting the right of Southwest Airlines to use Love Field." Defendants Continental, Dallas, Braniff, Regional Airport Board, and T. I., individually, and Delta, American, Frontier, Ozark and Eastern, collectively, have filed motions to dismiss, asserting various grounds therefor such as

lack of federal question jurisdiction, lack of diversity, abstention, unsettled questions of state law, and attempt by Southwest to secure an interlocutory appeal from an adverse ruling in state court. The court is of the opinion that such motions and grounds stated therefor are wholly without merit and are denied, for the reasons hereinafter stated.

A history of this litigation made at the April 3, 1975, preliminary injunction hearing, and as appears from judicial notice which this court can take of its own records, is appropriate.

In 1972, in Cause 3–5927–C, the City of Dallas, Texas, the City of Fort Worth, Texas, and the Dallas-Fort Worth Regional Airport Board sought declaratory judgment declaring their right under federal and state law to exclude Southwest, a purely intrastate air carrier, from Love Field on and after the opening of the new Dallas-Fort Worth Regional Airport. Defendant Southwest answered and counterclaimed against the Cities and the Regional Airport Board, seeking a declaration of its right under federal and state law to remain at Love Field and an injunction to protect that right. On May 11, 1973, in that case, hereinafter referred to as *Southwest I*, this court entered an order declaring that plaintiffs therein "could not exclude Southwest Airlines Co. from the use of Love Field, Dallas, Texas, and its airport facilities so long as Love Field remains open." An exhaustive opinion discussing all matters raised by the parties was filed on June 21, 1973, and at the end of that opinion this language was used: "As the Court is confident that Plaintiffs will abide by its ruling in this case and not attempt to interfere with or burden Southwest's right to use Love Field, an injunction to enforce its decree is deemed unnecessary." That opinion appears in 371 F.Supp. 1015, and reference is made thereto. That case was appealed to the Court of Appeals for the Fifth Circuit.

Braniff, which was competing with Southwest for intrastate commuter traffic between Houston, Texas, San Antonio, Texas, and Dallas, Texas, continued to operate flights out of Love Field even after the new Dallas-Fort Worth Regional Airport opened for business in January 1974. Texas International secured from state court an injunction authorizing its operation of intrastate flights out of Love Field so long as Braniff remained at Love Field.

While *Southwest I* was still on appeal and before the Fifth Circuit had rendered its judgment, the City of Dallas adopted Ordinance No. 14505 by which it sought to exclude all commercial airlines from Love Field, making it an offense for certificated airlines to land at Love Field and levying a fine of $200 per landing or takeoff. Southwest filed suit against Dallas in Cause 3–74–344–C, pending in this court, to enjoin the enforcement of that ordinance. Since the ordinance flew squarely in the face of the order entered by this court in *Southwest I*, preliminary injunction was granted. That case is hereinafter referred to as *Southwest II*. Braniff intervened in that case, likewise seeking to enjoin the enforcement of Ordinance 14505 and the Court likewise enjoined the enforcement of the ordinance insofar as Braniff was concerned.

On May 31, 1974, the Court of Appeals for the Fifth Circuit affirmed the judgment of this court. On June 24, 1974, it denied petitions for rehearing and rehearing en banc. On December 17, 1974, the Supreme Court denied petition for writ of certiorari (43 USLW through 4339) and thereafter on January 28, 1975, (43 USLW 3416), overruled the motion for rehearing of that denial. The opinion of the Court of Appeals for the Fifth Circuit appears in 494 F.2d 773.

It is interesting to note and worthy of comment here that Delta, American and Continental apparently recognized mutuality of interest in the outcome and filed amicus curiae briefs in the Fifth Court supporting the position of the Cities of Dallas and Forth Worth and

the Regional Airport Board. Some of the same attorneys representing those parties have appeared in this court in *Southwest II*, as well as in the state court case pending at Austin, Texas, and in the case at bar.

Further identification of the airlines that are defendants here and their relation to and interest in all of this litigation seems to be in order at this point.

In early 1970, in order to insure that sufficient revenues would be available to maintain and operate the Regional Airport and meet all debt service requirements on the Airport Revenue Bonds, Regional Airport Board executed Letters of Agreement with the eight CAB-certificated air carriers then serving the Dallas-Fort Worth area. The air carriers executing that Letter Agreement are defendants here: American, Braniff, Continental, Delta, Eastern, Frontier, Ozark and T.I., hence, their designation herein also as "signatory airlines".

By these Letter Agreements the signatory airlines agreed to move all of their certificated services serving the Dallas-Fort Worth area to the Regional Airport to the extent required under the terms of the 1968 Regional Airport Concurrent Bond Ordinance. Each of the CAB carriers contracted to pay rentals, fees, and charges for its use, operations and occupancy of the D–FW Airport in an amount which together with rentals, fees and charges paid by other airlines and others using the airport premises and facilities would be sufficient to produce total gross revenues required to satisfy the Airport Board's obligations to collect each year monies sufficient to maintain and operate the Airport plus 1.25 times the debt service requirements of the Regional Airport Revenue Bonds plus an amount equal to any other obligations required to be paid from the revenues of the Airport.

After some three and one-half years of hearings, litigation and appeals occa-sioned by competing CAB-certificated carriers, on June 18, 1971, Southwest commenced its purely intrastate operations between Love Field, Dallas, and Houston and San Antonio, having consistently refused to execute the Letter Agreement. By virtue of these Letter Agreements it would appear that defendant CAB carriers are in privity with defendants Dallas, Fort Worth and Airport Board.

The history of the D–FW/Love Field controversy was further complicated in 1974 when the two Cities brought an action in the Fort Worth Division of the United States District Court for the Northern District of Texas against T.I., Braniff and American Airlines. Initially the two Cities sought relief against American for its refusal to pay certain landing fees at D–FW. They also claimed relief against Braniff and T.I. for operating at Love Field in violation of the 1970 Letter Agreements. In March 1974, Delta intervened as plaintiff in that case and also sued Braniff and T.I. for damages due to increased landing fees at D–FW allegedly resulting from illegal use of Love Field by those two airlines. Procedural difficulties immediately developed when T.I. moved to dismiss the original complaint on grounds that neither federal question nor diversity jurisdiction existed. The alleged jurisdictional deficiencies triggered four of the parties to that case to voluntarily file a dismissal motion on March 22, 1974. Dismissal order was entered on March 26, 1974, and on the same day Delta and American brought another suit, this time suing Braniff, Dallas and Fort Worth for alleged breach of the 1970 Letter Agreements. Texas International was excluded as a defendant to that complaint. However, Fort Worth, by way of third-party complaint, brought in T.I. as a third-party defendant, claiming ancillary jurisdiction in the federal court.

Shortly after these procedural maneuverings, this court, believing that it was

in the best interest of all concerned—the airlines, the Cities and the public generally, not to mention the interests of justice and conservation of judicial time—consolidated the Fort Worth litigation into Southwest's suit against the City of Dallas. This court was of the opinion that a more proper and just resolution of the controversy could be effected. Toward that end this court advised CAB, Federal Aviation Commission (FAA), TAC, and the CAB carriers of the pending consolidated litigation and requested their participation. None of the CAB carriers except those already named in the lawsuits actively participated or intervened but did observe the proceedings through courtroom appearances of their representatives. Texas International again moved to dismiss the case, alleging that diversity citizenship between the parties had been improperly and collusively invoked in violation of 28 U.S.C. 1359. This motion to dismiss was denied but the court certified it to the Fifth Circuit as a controlling question of law under 28 U.S.C. 1292(b). Southwest moved for summary judgment in its portion of *Southwest II* and the court thereupon severed the ordinance dispute from the case originally filed in the Fort Worth Division of this court and on February 11, 1975, permanently enjoined the City of Dallas from enforcing Ordinance 14505 against Southwest. Within two weeks of that order all the remaining parties voluntarily dismissed their respective causes of action, undertaking thereby to terminate all of the *Southwest II* airport controversy insofar as the federal courts were concerned. The same controversy still raged, however. The parties simply changed the forum from the federal courts where they had enjoyed little success to a state court where they apparently hoped for a different result and are now pursuing their respective claims in Cause No. 227,349, styled *Texas International Airlines, Inc., v. Dallas-Fort Worth Regional Airport Board, et al,* in the 200th District Court, Austin, Texas.

This court is fully aware of the Anti-Injunction Statute, to wit, Title 28, Section 2283, United States Code, which provides:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, *or to protect or effectuate its judgments.*" (Emphasis added)

This court is of the opinion that the question presented here comes squarely within the emphasized part of that statute.

A reading of the pleadings thus far filed in the Austin suit clearly demonstrates that a proper alignment made according to every one's true interest would have all the parties except TAC suing Southwest. Texas International and some of the other parties (except the Cities and Regional Airport Board which have so far kept a low profile in this case) contended that the relief desired in the Austin case encompasses something altogether apart from Southwest's eviction from Love Field. However, paragraph 15 of T.I.'s petition purposes that the Austin court interpret the legal meaning of the Concurrent Bond Ordinance provision 2.1(g) defining "certificated air carrier service" and 9.-5(A) stating the Love Field "phase-out" covenants insofar as they relate to Southwest's use of Love Field, all of which this court has previously passed upon. The petition also asserts that TAC's authority to certificate Southwest's flights into Love and to issue Minute Order No. 22 is properly a subject for reinvestigation by the Austin court which was, of course, before this court and before the Fifth Circuit. The Fifth Court, speaking through Judge Gee in this case, said:

> "The power to designate 'routes' has, from times antedating any relevant to this case, been confided to that Commission. It deems self-evident that

points of origin and destination are part of every 'route,' particularly short-haul ones. Indeed, to hold that a city could deny the use of public facilities to an airline certificated to it by the Texas Aeronautics Commission would cripple, if not destroy, the Commission's powers to control intrastate routes. Any city having only municipal airports would have an absolute veto power over routes to and through it—routes which involve the convenience and necessity of the state public, not merely that of the city. And a partial veto would exist even where other facilities existed. Southwest has been certificated by the Commission into Love Field and directed to continue service there until told otherwise. At a minimum, this constitutes Texas' exercise of its power to determine that Southwest's is not an improper use of Love Field. Dallas being Texas' creature, it may, not declare otherwise. The cities' road to relief passes by the Texas Aeronautics Commission. They cannot reroute it by enacting ordinances in varying forms of words on a subject which is beyond their powers. 494 F.2d at 777.

In making this ruling the court relied upon the holding of the Supreme Court of Texas in *Texas Aeronautics Commission v. Braniff Airways, Inc.*, 454 S.W. 2d 199 (Tex.Sup.1970).

By its brief filed in this case T.I. asserts that the principal issues raised in the Austin case include (1) the validity and meaning of the term "certificated air carrier service" as used in the 1968 Regional Airport Concurrent Bond Ordinance, (2) the right of T.I. to enforce the 1968 Bond Ordinance against those entities which violated its terms, (3) whether TAC's Minute Order No. 22 was intended to or may be construed to regulate the operation of Love Field, (4) the statutory power and authority of TAC to enact Minute Order No. 22, and (5) the validity of the financing agree-

ment between T.I. and the Airport Board in the event the 1968 Bond Ordinance is found to be invalid or ineffectual to remove all scheduled air carrier service from Love Field which operate *in violation of its terms.* A casual reading of this court's opinion and order as well as the opinion of the Fifth Court would demonstrate that T.I. simply seeks to relitigate many of the propositions of law already determined by this court.

Additionally, one of the attorneys for Continental argued to Judge Matthews of the Austin court: ". . . Mr. Kelleher in his brief and to some extent in his argument talks about that this is an effort to undermind [sic] the federal court decision. That is not really an accurate characterization, Your Honor. *This is a frontal attack on it. The word undermind [sic] implies something covert about it. We come in with flags flying."* (Emphasis added). See Defendant T.I.'s Exhibit No. 15 introduced at the April 3, 1975, hearing in this court. That part of the argument was made in the hearing on Defendant Southwest's pleas in abatement filed in the Austin court and which pleas were overruled by Judge Matthews by order dated February 21, 1975.

■ The concepts of cooperative federalism and comity although providing reason for federal courts to hesitate interfering with state court proceedings nevertheless do not prevent the undesirable friction created by the two court systems when a state court is allowed to reinterpret and perhaps upset a binding federal court judgment. *Jacksonville Blow Pipe Co. v. Reconstruction Finance Corporation,* 244 F.2d 394 (5th Cir. 1957); *American Radio Association v. Mobile Steamship Association,* 483 F.2d 1 (5th Cir. 1973). It seems appropriate here to point out also that the "exquisite friction" produced by collisions and near collisions between state and federal authority are most frequently produced when disgruntled litigants hop from one court to the other in the hope of secur-

ing a contrary result. The Cities, the Airport Board and all of the airlines, whether actually parties in *Southwest II* or interested observers cheering on the efforts of the Cities and the Airport Board in *Southwest I*, are now on the playing field seeking a relitigation in state court of issues already determined by this court.

■ Ever since this court decided *Southwest I*, some or all of the defendants have insisted that this court should abstain on the grounds that only state affairs were involved. It is to be recalled that the Cities and the Airport Board resorted to this court because a federal question was involved and this court proceeded to hear and decide that question as well as other questions related to it. It was even suggested that this court abstain in *Southwest II* where Dallas had adopted an ordinance in direct contravention of this court's judgment in *Southwest I*. I share the concern of all of the federal courts for the values of federalism and comity which in normal circumstances preclude federal court intervention with state proceedings and the abstention doctrine as expounded in *Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Huffman v. Pursue, Ltd.*, (Supreme Court) 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), as well as *Dresser Industries v. Insurance Company of North America*, 358 F.Supp. 327, aff'd 475 F.2d 1402. In citing *Dresser* to this court, defendants wholly overlook the facts of that case. In that case there was no judgment nor order of the federal court involved. The parties there were not seeking to relitigate an issue already determined in the federal court. The plaintiff's petition in *Dresser* sought from this court a declaratory judgment in effect telling the state court how to there try the pending case. In my opinion the general prohibition of *Huffman v. Pur-*

*sue* and *Younger v. Harris* are not apposite in this case since an injunction against the trial in state court would fall within the "protective jurisdiction" exception of the Anti-Injunction Act. For the same reasons the abstention doctrine can have no application here.

Plaintiff Southwest relies on the doctrines of "virtual representation", "res judicata" and "collateral estoppel".

In support of its "virtual representation" doctrine, plaintiff cites *Berman v. Denver Tramway Corporation*, 197 F.2d 946 (10th Cir. 1952). In that case Berman, a resident of the City and County of Denver, brought suit in state court seeking to enforce city ordinances limiting the fares to be charged by the local company. Denver Tramway Corporation, defendant in that proceeding, filed an action in federal court for an injunction against the state court proceeding on the ground that it constituted an impermissible relitigation of matters determined twenty-four years previously in a federal suit between Denver Tramway and the City and County of Denver. In that prior litigation the federal court had found the ordinances in question to be invalid and had permanently enjoined the local government from enforcing them. The federal district court enjoined Berman from prosecuting the state court action, finding it to be the relitigation of a matter finally settled in the prior federal suit. The Tenth Circuit, in response to Berman's claim that the district court had been without jurisdiction, said:

"A federal court is clothed with power to secure and preserve to parties the fruits and advantages of its judgment or decree. In the appropriate exercise of that power, the court has jurisdiction through means of a supplemental proceeding to enjoin the relitigation in a state court of a matter litigated, determined, and adjudicated by its valid decree regularly entered, if the result of the relitigation would be to destroy the effect of the decree ren-

dered in the United States Court. And jurisdiction of the court to entertain such a supplemental proceeding is not lost by the intervention of time or the discharge of the res from the custody of the court. A supplemental proceeding of that kind may be entertained where the relitigation in the state court would result in nullifying the judgment or decree of the United States Court, or would render doubtful the rights of the parties in respect to the effectiveness of such judgment or decree. (Citing cases.) And for the purpose of protecting the effectiveness of its judgment or decree, a United States Court may entertain an independent action rather than a supplemental proceeding in the original action to enjoin the relitigation in a state court of matters already fully adjudicated in the United States Court. (Citing authority.) Viewed in the light of these cases, it is clear that for the purpose of effectuating and protecting the final decree rendered in 1924, the court had jurisdiction to entertain the supplemental proceeding to enjoin Berman from relitigating in the state court issues and controversies previously litigated and adjudicated in such final decree."

Defendants argue that *Berman* is old, worn-out, and no longer viable authority for this court's consideration. Defendants, however, overlook the fact that on April 21, 1975, the Fifth Court bridged this gap in *Aerojet-General Corporation v. Askew*, 511 F.2d 710, in which the court determined the rights of a state agency to contest the title to certain lands before the Florida Supreme Court after a United States District Court and the Circuit Appeals Court had already ruled on the subject. In upholding the United States District Court which enjoined mandamus proceedings pending in the Florida Supreme Court, the Fifth Court said:

"Federal law clearly governs the question whether a prior federal court judgment based on federal question jurisdiction is res judicata in a case also brought, as this one was, under federal question jurisdiction . . . Under the federal law of res judicata, a person may be bound by a judgment *even though not a party* if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." (Emphasis added.)

The fact that the CAB carriers are neither private citizens of Texas nor affiliated governmental bodies is recognized; however, as above stated, the 1970 Letter Agreements show the identity and mutuality of interests between the Airport Board, the Cities, and the airlines. Defendants' argument that their private business interests cannot be analogized to the Denver citizens in the *Berman* case is without merit. The economic interests of the Airport Board, the Cities, and the signatory airlines were fully developed before this court in *Southwest I* and argued before the Fifth Court and rejected as not being sufficient to justify the "unjust discrimination" under the 1958 Federal Aviation Act that would result if Southwest were evicted from Love Field while that airport continued its other air service. It seems obvious that the interests, business or otherwise, of the CAB carriers were merged into those interests held by the Cities as enforcers of the public's right. "Whether a party's interests in a case are virtually representative of the interests of a nonparty is one of fact for the trial court." *Aerojet-General v. Askew, supra.*

The contention of the CAB carriers is candidly and clearly expressed at page 17 of the "Brief in Opposition to Preliminary Injunction on Behalf of Delta Air Lines, Inc., American Airlines, Inc., Frontier Airlines, Inc., Ozark Air Lines, Inc., and Eastern Air Lines, Inc.": ". . . the CAB carriers . . . are therefore entitled to seek judicial enforcement of the (1968 Bond) Ordinance." It is difficult to understand how defendant airlines can bootstrap themselves to claim some right or power greater than Dallas and Fort Worth

which enacted the 1968 Ordinance. The CAB carriers can have no contract right with Southwest; they have no property right in Love Field; they have no order from CAB or TAC. The mutuality of interests of the CAB carriers with the Cities and the Airport Board must be held to have been established by the execution of the 1970 Letter Agreements. The right of the CAB carriers can only be a derivative right, and they take the 1968 Ordinance as they find it.

The doctrine of "collateral estoppel" almost appears to be another name for the doctrine of "virtual representation". The doctrine of "collateral estoppel" has also been reviewed and applied by the Court of Appeals for the Fifth Circuit in several cases in recent years. As above stated, the 1970 Letter Agreements created a "privity relationship" between the Airport Board and the Cities on the one hand and the CAB airlines on the other. As related to the collateral estoppel doctrine, "privity" often refers to a non-party's interests in some litigation being so closely aligned or identified with the actual litigant's interests that the latter in fact represent the same legal rights. The most recent case by the Fifth Court is *International Association of Machinists and Aerospace Workers, et al, v. Franklin W. Nix*, 512 F.2d 125 (1975), in which the United States District Court at Atlanta enjoined further prosecution of certain counts of a state court action and Judge Gewin, in affirming the judgment of the trial court, made an exhaustive analysis of the authorities, including the "relitigation exception" of the Anti-Injunction Statute as well as the principle of collat-

eral estoppel. Other cases by the Fifth Court include *Cauefield v. Fidelity and Casualty Company*, 378 F.2d 876 (5th Cir. 1967), cert. denied 389 U.S. 1009, 88 S.Ct. 571, 19 L.Ed.2d 606 (1967), in which the doctrine was held applicable to a non-party;[1] *Seguros Tepeyac, S.A., Compania Mexicana v. Jernigan*, 410 F. 2d 718; *Wilson v. Retail Credit Co.*, 474 F.2d 1261 (5th Cir. 1973); *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108 (5th Cir. 1973);[2] *Cheramie v. Tucker*, 493 F.2d 586 (5th Cir. 1974) (see footnote 10 as to non-parties).

This court is of the opinion that under the doctrines of "virtual representation", "res judicata", "collateral estoppel", by whatever label we call it ("that which we call a rose—by any other name would smell as sweet"), and the facts of this case, plaintiff Southwest is entitled to an injunction enjoining and restraining defendants from relitigating in state court or in any other court action the validity, effect or enforceability of the 1968 Regional Airport Concurrent Bond Ordinance of the Cities of Dallas and Fort Worth insofar as it may affect the right of plaintiff Southwest Airlines to the continued use of and access to Love Field so long as Love Field remains open. As was so aptly said in *Wilson v. Retail Credit Co., supra*,

"Every citizen is entitled to his day in court; however, our judicial system was not designed as an experimental laboratory to license losing parties to bring vexatious and repetitive claims based on the same transaction."

Order granting preliminary injunction will be filed herewith.

1. This case is a graphic illustration of the important interests which estoppel of nonparties may serve. It seems obvious that in a transaction involving 41 potential plaintiffs who might litigate identical claims against the same alleged tort feasor, the defendant's interests in avoiding vexatious, lengthy and costly relitigation of the issues as well as the judicial system's interest in economy and

avoiding inconsistent results are extremely powerful.

2. In which Judge Goldberg held that a federal district court properly enjoined Louisiana Parish officials from proceeding with a state court suit where the injunction was needed in aid of the federal court's jurisdiction.