**SOUTHWEST AIRLINES COMPANY,**
**Plaintiff-Appellee,**

v.

**TEXAS INTERNATIONAL AIRLINES,**
**INC., et al., Defendants-Appellants,**

v.

**TEXAS AERONAUTICS COMMISSION,**
**Intervenor-Appellee.**

No. 75–2539.

United States Court of Appeals,
Fifth Circuit.

Jan. 28, 1977.

Rehearing and Rehearing En Banc
Denied March 17, 1977.

Sam Coats, Houston, Tex., George W. Bramblett, Jr., Dallas, Tex., for Texas Intern.

James W. Wilson, Joe M. Kilgore, Austin, Tex., for Continental, and others.

G. Edward Cotter, Sr., Gen. Counsel, Continental Airlines, Inc., Los Angeles, Cal., for Continental Airlines, Inc.

Eugene Jericho, Dallas, Tex., Robert S. Harkey, Law Dept., Delta Airlines, Inc., Atlanta, Ga., for Delta, and others.

Jerry Prestridge, Donald S. Thomas, Austin, Tex., for Delta.

R. A. Lempert, H. Wayne Wile, Asst. Gens. Counsel, New York City, for American Airlines, Inc.

W. Glen Harlan, Eastern Airlines, Inc., New York City, for Eastern Airlines, Inc.

S. G. Johndroe, Jr., City Atty., Dept. of Law, Ft. Worth, Tex., for Cty. of Ft. Worth.

W. B. West, III, Wm. F. Carroll, Dallas, Tex., for Braniff Airways, Inc.

John L. Hauer, Clarice M. Davis, W. Michael Byrd, Jr., Dallas, Tex., for Southwest Airlines.

Herbert D. Kelleher, Gary A. Barron, San Antonio, Tex., J. David Hughes, Asst. Atty. Gen., Austin, Tex., for Tex. Aeronautics Comm.

N. Alex Bickley, City Atty., Lee E. Holt, Dallas, Tex., for City of Dallas.

Charles C. Wells, Dallas–Ft. Worth Regional Airport Bd., C. Merrill Bierfeld, Dallas, Tex., for Dallas–Ft. Worth Regional Airport Bd.

Before WISDOM and INGRAHAM, Circuit Judges, and GROOMS,* District Judge.

WISDOM, Circuit Judge:

Southwest Airlines Co. has returned to the federal courts for the second time in

* Senior District Judge for the Northern District of Alabama, sitting by designation.

two years to preserve a 1973 judgment in a federal district court. The recurring litigation concerns Southwest's right to continue its air passenger services at Love Field in Dallas, Texas, and to avoid a forced move to the new Dallas-Fort Worth Regional Airport. The district court granted Southwest a preliminary injunction against relitigation in state court of the issues decided in 1973. We affirm.

## I. FACTS

The complicated procedural history, recounted in three previous opinions,[1] deserves brief repetition. The dispute began with a Civil Aeronautics Board order in 1964, requiring the Cities of Dallas and Fort Worth to designate a single airport for CAB-approved service in their region. The cities agreed to construct a new airport midway between them. To carry out the plan, they adopted the 1968 Regional Airport Concurrent Bond Ordinance. Besides authorizing the issuance of revenue bonds, the ordinance provided for a phase-out of commercial passenger air service at Love Field.[2] In 1970 eight CAB-certified air lines, appellants in this case, executed letter agreements with the Dallas/Fort Worth

Regional Airport Board agreeing to "move all of [their] certified Air Carrier Services serving the Dallas-Fort Worth area to the [new] airport . . . to the extent required under the terms of the 1968 Regional Airport Concurrent Bond Ordinance." [3]

Southwest Airlines began its intrastate commercial air service from Love Field in 1971 under a certificate issued by the Texas Aeronautics Commission (TAC).[4] The certificate authorized service from any airport in the area. On November 12, 1971, however, the TAC ordered all certified airlines not to change airports without written approval from the Commission.[5] After notifying the Regional Airport Board in 1971 of its intention to remain at Love Field, Southwest petitioned the Board for a waiver of the 1968 ordinance. Instead of determining whether the ordinance phase-out provisions applied to the airline, the Board concluded that the original CAB proceedings deprived the Board of jurisdiction.

The cities and the Airport Board then filed the first federal court suit[6] (*Southwest I*), requesting a declaratory judgment of their right to exclude Southwest from Love Field. Southwest counterclaimed for a declaratory judgment of its right to re-

---

1. *City of Dallas v. Southwest Airlines Co.,* N.D. Tex.1973, 371 F.Supp. 1015, aff'd, 5 Cir. 1974, 494 F.2d 773, *rehearing denied,* 496 F.2d 1407, *cert. denied,* 1974, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674, *rehearing denied,* 420 U.S. 913, 95 S.Ct. 837, 42 L.Ed.2d 845; *Southwest Airlines v. Texas International Airlines,* N.D.Tex. 1975, 396 F.Supp. 678.

2. Section 95 of the Ordinance states that the cities:

 . . . shall take such steps as may be necessary, appropriate and legally permissible (without violating presently outstanding legal commitments or covenants prohibiting such action), to provide for the orderly, efficient and effective phase-out at Love Field, Redbird, GSIA and Meacham Field, of any and all Certificated Air Carrier Services, and to transfer such activities to the Regional Airport effective upon the beginning of operations at the Regional Airport.

3. The Agreement also required each CAB air line:

 . . . to pay rentals fees and charges for its use, operations and occupancy of the Airport premises and facilities and the services

appertaining thereto in an amount which, together with the rentals, fees and charges paid by other Airlines and others using the Airport premises and facilities, will be sufficient to produce total gross revenues required to satisfy the Airport Board's obligation . . .

plus enough money to maintain the facility and to accumulate 1.25 times the debt service requirements on the Regional Airport revenue bonds.

4. Because Southwest offers only intrastate service it is not licensed by the CAB, nor subject to CAB jurisdiction. *See City of Dallas v. Southwest Airlines Co.,* N.D.Tex.1973, 371 F.Supp. 1015.

5. Texas Aeronautics Commission Minute Order No. 22.

6. *City of Dallas v. Southwest Airlines Co.,* N.D. Tex.1973, 371 F.Supp. 1015, *aff'd,* 5 Cir. 1974, 494 F.2d 773, *rehearing denied,* 496 F.2d 1407, *cert. denied,* 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674, *rehearing denied,* 420 U.S. 913, 95 S.Ct. 837, 42 L.Ed.2d 845.

main at the field and for an injunction to enforce that right. The TAC intervened as a party-defendant and adopted Southwest's position. On both federal and state law grounds,[7] the district court declared that the cities and the Board could "not lawfully exclude the defendant, Southwest Airlines Co., from the use of Love Field, Dallas, Texas, and its airport facilities so long as Love Field remains open as an airport." *City of Dallas v. Southwest Airlines Co.,* N.D.Tex.1974, 371 F.Supp. 1015, 1035. This Court affirmed the holding, but only on the state law grounds. *City of Dallas v. Southwest Airlines Co.,* 5 Cir. 1974, 494 F.2d 773, 776–77.[8]

Dallas responded to the district court's judgment by passing a criminal ordinance that levied a two-hundred-dollar fine for each takeoff or landing at Love Field by an airplane of a certified airline. Southwest then brought another suit in federal court (*Southwest II*) to enjoin enforcement of that ordinance. Braniff intervened as party-plaintiff. *Southwest II* was then consolidated with yet another action brought by Delta and American against Braniff and the cities over violations of the 1970 Letter Agreements.[9] After Southwest moved for

summary judgment, however, the district court severed the ordinance dispute from the case and enjoined Dallas from enforcing the ordinance against either Southwest or Braniff.[10] The remaining parties then voluntarily dismissed their respective causes of action and refiled them in the state court case that is the object of this suit (*Austin*).[11]

The pleadings in *Austin* raised questions identical with those decided in *Southwest I.* After recounting Southwest's refusal to leave Love Field, Texas International expressed its primary concern that Southwest's continued service at Love Field would put Texas International at a competitive disadvantage. Consequently, the plaintiff alleged:

A justiciable controversy exists as to the meaning and effect of Southwest's TAC certificate of convenience and necessity and the TAC Minute Order No. 22. The TAC and Southwest contend that under the Texas Aeronautics Act and the Texas Municipal Airports Act (Articles 45c and 45d [sic., 46c and 46d] Vernon's Texas Civil Statutes), the TAC has the statutory authority to adopt orders regulating and controlling the City of Dallas

---

**7.** The district court concluded that the Ordinance, if applicable to Southwest, would violate the federal prohibition "against unjust discrimination and the grant of an exclusive right" of access to some carriers and not others. 371 F.Supp. at 1026, citing 49 U.S.C. §§ 1110(1), 1718(1), 1349(a). The discrimination resulted from the phase-out provisions in Section 2.1G of the Ordinance, which would have allowed continued service at Love Field by commercial air taxis, unscheduled charters, unscheduled cargo planes, and even intrastate planes of the CAB carriers. 371 F.Supp. at 1027. If Southwest were banned, the district court concluded, the ordinance would discriminate even though the CAB carriers had chosen to move all of their services to the Regional Airport. *Id.* at 1028. Furthermore, the district judge found that "the Cities' only reason for barring Southwest Airlines from Love Field is to avoid the potential competitive effect on the regional airport", a violation of "the federal prohibition of the grant of an exclusive right at airports upon which federal funds have been expended". *Id.* at 1029.

The Ordinance violated state law by usurping the power of the TAC. After construing the TAC certification and order as authorization to

serve Love Field specifically, the court held that the cities had no authority to order contrary performance. 371 F.Supp. at 1033, *citing* Tex.Const. art. 11, § 5; Vernon's Ann.Tex.Stat. art. 46d–7(b) and 1165.

**8.** *Southwest Airlines Co. v. City of Dallas*, N.D. Tex.1974, No. CA3–3–74–344–C.

**9.** Braniff and Texas International had continued to serve Love Field. Fort Worth brought Texas International into the litigation by a third party complaint.

**10.** The district court had assumed the good faith of the City of Dallas in *Southwest I*:

As this Court is confident that Plaintiffs will abide by its ruling in this case and not attempt to interfere with or burden Southwest's right to use Love Field, an injunction to enforce its decree is deemed unnecessary.

The district court issued the injunction, then, only after Dallas demonstrated that the court had misplaced its confidence.

**11.** *Texas International Airlines, Inc. v. Dallas-Fort Worth Regional Airport Board,* 200th D.Ct.Tex., No. 227349 (filed Dec. 10, 1974).

in the operation of Love Field so as to prevent Dallas from closing Love Field to TAC certificated service without the approval of the TAC and that Southwest's certificate of convenience and necessity and TAC Minute Order No. 22 prohibiting TAC certificated air carriers from changing airports without TAC approval constitute regulatory orders with this effect. The United States District Court for the Northern District of Texas, Dallas Division, and the United States Court of Appeals for the Fifth Circuit have upheld this interpretation of the Texas statutes in an action to which none of the signatory airlines is a party. The judgment in the said action is not final, but in any event this interpretation of the Texas statutes is not binding of the courts of Texas. Texas International denies that Southwest's certificate and TAC Minute Order No. 22 have this meaning or effect, but contends that such regulatory orders are void for lack of statutory authority. Alternatively, Texas International contends that such TAC Minute Order is void for lack of notice and hearing,

An attorney for Continental then argued orally before the state court:

This is [not] an effort to undermine the federal decision. . . . This is a frontal attack on it. The word undermined implies something covert about it. We come in with flags flying.[12]

The federal district court has preliminarily enjoined this "frontal attack", thereby precluding the CAB airlines, the cities, and the airport board:

from relitigating in state court . . . or in any other court action the validity, effect or enforceability of the 1968 Regional Airport Concurrent Bond Ordinance of the Cities of Dallas and Fort Worth insofar as it may affect the right of plaintiff Southwest Airlines Co. to the

continued use of and access to Love Field, so long as Love Field remains open. . .[13]

Southwest's right of access to Love Field arises from the declaratory judgment in *Southwest I*, a suit in which the CAB airlines were not parties. But the district court found that Delta, American and Continental had filed amicus briefs with this Court in *Southwest I*. Several of the same attorneys for those parties appeared before the district court in *Southwest II* and before the Texas court in *Austin*.[14] Lawyers for Texas International and Braniff also participated in *Southwest II*, and attorneys for the other CAB lines apparently observed those proceedings.[15] We now face the question whether the judgment in *Southwest I* can support the preliminary injunction against not only the cites and the airport board, the plaintiffs in *Southwest I*, but also the eight CAB carriers.

## II. JURISDICTION

The appellants challenge the jurisdiction of the district court by arguing that none of the statutory bases claimed by Southwest should apply. They correctly assert that no diversity of parties exists and that the Anti-injunction Act, 28 U.S.C. § 2283, does not establish an independent basis of jurisdiction. *Tyler v. Russell*, 10 Cir. 1969, 410 F.2d 490, 491; *Baines v. City of Danville*, 4 Cir. 1964, 337 F.2d 579, 593; *aff'd*, 1966, 384 U.S. 890, 86 S.Ct. 1915, 16 L.Ed.2d 966, *rehearing denied*, 385 U.S. 890, 87 S.Ct. 12, 17 L.Ed.2d 121; *Schell v. Food Machinery Corp.*, 5 Cir. 1937, 87 F.2d 385, 387, *cert. denied*, 300 U.S. 679, 57 S.Ct. 670, 81 L.Ed. 883. The appellants also deny the existence of federal question jurisdiction because Southwest presents no federal issues that were not litigated in *Southwest I*.

In response, Southwest cites four cases[16] but does not explain any basis for jurisdic-

**12.** *Southwest Airlines Co. v. Texas International Airlines, Inc.*, N.D.Tex.1975, 396 F.Supp. 678, 683, *citing* Defense Exhibit No. 15.

**13.** *Id.* at 18.

**14.** *Id.* at 5.

**15.** *Id.* at 8–9.

**16.** *International Ass'n of Mach. & Aero Wkrs. v. Nix*, 5 Cir. 1975, 512 F.2d 125; *Donelon v. New Orleans Terminal Co.*, 5 Cir. 1973, 474 F.2d 1108, *cert. denied*, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105; *Johnson v. Redford*, 5 Cir.

tion. Although none of the recent cases cited provides an explanation. *Berman v. Denver Tramway Corp.*, 10 Cir. 1952, 197 F.2d 946, does suggest that an action for an injunction to enforce a federal judgment is "supplemental" to the original case. *Id.* at 950. Early Supreme Court decisions termed this equity power "ancillary". In *Dugas v. American Surety Co.*, 1937, 300 U.S. 414, 57 S.Ct. 515, 81 L.Ed. 720, rehearing denied, 301 U.S. 712, 57 S.Ct. 787, 81 L.Ed. 1365, a federal judgment had relieved the Company of future liability to Dugas. Later, he brought a state court suit that could have contravened the federal judgment. When the company filed a federal action to enjoin the state proceeding, the Supreme Court held that federal jurisdiction extended to the later suit:

> The jurisdiction to entertain the supplemental bill is free from doubt. Such a bill may be brought in a federal court in aid of and to effectuate its prior decree may be carried into execution or that it may be given fuller effect. . . . Such a bill is ancillary and dependent, and therefore the jurisdiction follows that of the original suit, regardless of the citizenship of the parties to the bill or the amount in controversy.[17]

▆▆▆ Without this doctrine, judgments of federal courts would have little effect whenever later circumstances would preclude a party from reestablishing independent jurisdiction. Diversity of citizenship or the jurisdictional amount in controversy could easily change with time. Yet such changes should not enable parties to overturn federal judgments by relitigating issues in state courts. We therefore consider

this action as supplemental or ancillary to *Southwest I*, over which the district court properly asserted federal question jurisdiction. A state court judgment in *Austin* could contravene Southwest's rights as defined by the district court in 1973. To effectuate the prior decree, then, the district court had jurisdiction to address the merits of Southwest's claims.

## III. FEDERALISM

The appellants argue that the Anti-injunction Act, 28 U.S.C. § 2283,[18] and the judicial doctrine of abstention should preclude an injunction of the *Austin* proceedings. Cast in terms of federalism, the argument posits that the district court should have abstained in *Southwest I* to avoid disruption of the internal affairs of the State of Texas. *See Burford v. Sun Oil Co.*, 1943, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, *rehearing denied*, 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851; *Barrett v. Atlantic Richfield Co.*, 5 Cir. 1971, 444 F.2d 38; *W. S. Ranch Co. v. Kaiser Steel Corp.*, 1968, 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835. Because the court should have abstained, the argument continues, *Southwest I* forecasts Texas law on the respective authority of the cities and the TAC to regulate Love Field. *See Chicago v. Fieldcrest Dairies, Inc.*, 1942, 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355; *Railroad Commission v. Pullman Co.*, 1941, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971. As only a forecast, the judgment in *Southwest I* should not receive the protection of a federal injunction, the appellants conclude, because the Texas courts should still be able to decide the state law questions. We would preclude such resolu-

1971, 449 F.2d 115; *Berman v. Denver Tramway Corp.*, 10 Cir. 1952, 197 F.2d 946.

**17.** 300 U.S. at 428, 57 S.Ct. at 521. *See Root v. Woolworth*, 1893, 150 U.S. 401, 14 S.Ct. 136, 37 L.Ed. 1123, in which Woolworth sued in equity to enforce an earlier decree quieting title. The Court said:

> The jurisdiction of courts of equity to interfere and effectuate their own decrees by injunctions or writs of assistance, in order to avoid the relitigation of questions once settled between the same parties is settled.

*Id.* at 411–12, 14 S.Ct. at 139, 37 L.Ed. at 1126. *Hamilton v. Nakai*, 9 Cir. 1972, 453 F.2d 152, *cert. denied*, 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332, demonstrates the current vitality of this doctrine.

**18.** The section states:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

tion by sustaining the injunction because only Southwest's case can present the peculiar factual clash litigated in *Southwest I* between the cities and the TAC.[19]

■ To evaluate the appellants' argument, we must apply the principles of federalism to the unusual facts of this case. We begin with the instruction of the Supreme Court that

few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to the enforcement of the criminal law . . . or the final authority of a state court to interpret doubtful regulatory laws of the state.[20]

We have applied this admonition not only in abstention cases,[21] but also in cases under the Anti-Injunction Act. For instance, *International Association of Machinists and Aerospace Workers v. Nix,* 5 Cir. 1975, 512 F.2d 125, noted that the purpose of section 2283 is to "avoid unseemly conflict between the state and federal courts." Congress has decided that frequent injunctions against state proceedings by the federal judiciary would not engender the harmonious relations necessary to the functioning of our federal system.

■ Whether an "unseemly conflict" disturbs the harmony of the system, however, turns on the facts of each case. Here, we conclude that the preliminary injunction, rather than damaging federal-state relations, would begin to restore the harmony interrupted by the filing of *Austin.* First, Congress has specifically excepted from the ban of section 2283 all injunctions "to protect or effectuate . . . judgments" of the federal judiciary. This unqualified exception recognizes that the states, as well as the federal government, have a responsibility to maintain the harmony we cherish. As we first said in *Jacksonville Blow Pipe v. Reconstruction Finance Corp.,* 5 Cir. 1957, 244 F.2d 394, 400:

[N]othing would be as productive of friction between the state and federal courts as to permit a state court to interpret and perhaps to upset such a judgment of a federal court.[22]

Friction is also avoided by an injunction that:

prevents multiple litigation of the same cause of action and . . . assures the winner in a federal court that he will not be deprived of the fruits of his victory by a later contrary state judgment which the Supreme Court may or may not decide to review.[23]

These policies support an injunction here, for the appellants have admittedly launched in *Austin* a "frontal attack" on the judgment of the federal court. Furthermore, the preliminary injunction would temporarily thwart the purpose of the assault and thereby guarantee to Southwest the fruits of its victory in *Southwest I.*

---

19. The district court injunction applies, quite narrowly, to relitigation of the Love Field controversy only as it affects Southwest. The CAB airlines can continue to litigate their rights to serve Love Field even if the injunction is affirmed. Because the CAB rather than the TAC regulates them, however, they will not be able to present a TAC-City of Dallas clash directly to the Texas courts. Nevertheless, another set of facts could present to the Texas courts the question of the relative powers of the TAC and local governments to regulate airports. The district court injunction would not reach such a case as long as the state decision did not attempt to contravene Southwest's rights under the 1973 judgment.

20. *Railroad Comm'n v. Pullman Co.,* 1941, 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed.2d 971, 974, *quoted in Alabama Pub. Serv. Comm'n v. Southern Ry. Co.,* 1951, 341 U.S. 341, 350, 71 S.Ct. 762, 95 L.Ed. 1002, 1009.

21. *E. g., Barrett v. Atlantic Richfield Co.,* 5 Cir. 1971, 444 F.2d 38; *Harris v. Samuels,* 5 Cir. 1971, 440 F.2d 748, *cert. denied,* 404 U.S. 832, 92 S.Ct. 77, 30 L.Ed.2d 62; *Creel v. City of Atlanta,* 5 Cir. 1968, 399 F.2d 777.

22. *Quoted in International Ass'n of Mach. & Aero. Wkrs. v. Nix,* 5 Cir. 1975, 512 F.2d 125, 130.

23. *Woods Exploration & Prod. Co. v. Aluminum Co. of America,* 5 Cir. 1971, 438 F.2d 1286, 1312, *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736.

 Second, the Supreme Court has instructed that abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in . . . exceptional circumstances." *Alleghany County v. Frank Mashuda Co.,* 1959, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163, 1166, *see Baggett v. Bullitt,* 1964, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed. 377. In other words, before our deference to federalism can justify deviation from routine federal procedures—be they exercises of jurisdiction or the protection of rights garnered in federal judgments—we must confront a significant disruption of federal-state relations.[24] That a federal court must interpret state law does not by itself threaten such a disturbance.[25] A contrary rule would destroy diversity jurisdiction and would render obsolete theories of pendent jurisdiction. This Court has therefore followed the instruction of *Harman v. Forssenius,* 1965, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50, and *Reetz v. Bozanich,* 1970, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68, that courts should refuse to abstain where the issue of state law is clear. *Moreno v. Henckel,* 5 Cir. 1970, 431 F.2d 1299, 1308. These decisions are consistent with the numerous cases in which courts have abstained only after deciding that they faced unclear questions of state law.[26]

In *Southwest I,* however, the federal courts faced an issue of Texas law with a clear answer. The issue concerned the relative authority of the TAC and the City of Dallas to control access to Love Field, and Judge Gee responded:

> It has a simple answer. In a recent decision, the Texas Supreme Court had occasion to consider the powers of the Texas Aeronautics Commission. . . .
>
> "The decision as to where the public interest lies and what air service is best for Texas must be made by the Texas Aeronautics Commission." . . .
>
> . . . Indeed, to hold that a city could deny the use of public facilities to an airline certificated to it by the Texas Aeronautics Commission would cripple, if not destroy, the Commission's powers to control intrastate routes.

*City of Dallas v. Southwest Airlines,* 5 Cir. 1974, 494 F.2d 773, 776–77, *quoting Texas Aeronautics Commission v. Braniff Airways, Inc.,* Tex.Sup.Ct.1970, 454 S.W.2d 199, *cert. denied,* 400 U.S. 943, 91 S.Ct. 244, 27 L.Ed.2d 247. As both the district and circuit opinions explain, to rule otherwise would disregard the plain language of the Texas Constitution, the Texas Municipal Airports Act, the Texas Aeronautics Act, and statutes regulating home rule cities, all of which support TAC authority over the controversy. 494 F.2d at 777; 371 F.Supp. at 1032–34. Because the state law is so

---

**24.** *Markham v. Allen,* 1946, 326 U.S. 490, 495, 66 S.Ct. 296, 299, 90 L.Ed. 256, 260 (an alien property custodian after World War II raised questions of state probate law in his suit to determine his appropriate share of the decedent's estate).

**25.** This case does not fall within the *Pullman* line of cases in which courts have abstained in order to avoid deciding constitutional questions. *Railroad Comm'n v. Pullman Co.,* 1941, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; *see Reetz v. Bozanich,* 1970, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68; *Gray Line Motor Tours, Inc. v. City of New Orleans,* 5 Cir. 1974, 498 F.2d 293; *Freda v. Lavine,* 2 Cir. 1974, 494 F.2d 107; *Harris v. Samuels,* 5 Cir. 1971, 440 F.2d 748.

**26.** For example in *City of Meridian v. Southern Bell Tel. & Tel. Co.,* 1959, 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562, the company challenged a Mississippi tax on public utilities. The state law issue concerned whether the statute applied to the petitioner. After noting that "the state law problems are delicate ones, the resolution of which is not without substantial difficulty," the Court ordered abstention. In *Freda v. Levine,* 2 Cir. 1974, 494 F.2d 107, a state regulation on eligibility for Aid to Families with Dependent Children lacked clarity. Consequently, the Court referred the issue to the state before considering the constitutional issues in the case. In *Romero v. Coldwell,* 5 Cir. 1972, 455 F.2d 1163, the appellants challenged the selection of Justices of Peace in El Paso County, Texas. The state attorney general had said that the selection process might have violated the state constitution. We ordered abstention in part because of the confused nature of the state law.

clear, the federal courts did not violate any principles of federalism by proceeding to judgment without abstention in *Southwest I.*

 Third, the appellants also submit that the earlier case breached federalism policy in that the federal courts decided a state law question bearing upon internal state affairs. The carriers cite the line of cases following *Burford v. Sun Oil Co.,* 1943, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, to support the proposition. Although this Court has followed *Burford,* e.g., *Barrett v. Atlantic Richfield Co.,* 5 Cir. 1971, 444 F.2d 38, its doctrine does not apply in this case. To begin with, all of the cases cited by appellants involved truly unsettled questions of state law on internal affairs.[27] This distinguishes them from the instant case in which a Texas Supreme Court ruling, the Texas Constitution, and Texas statutes clearly dictated the federal decision. Furthermore, the decision in *Southwest I* did not disrupt the harmonious relations between the state and federal governments; the state agencies themselves requested the

federal decision. The cities, not Southwest, brought the federal suit. The TAC intervened voluntarily in the action. No agency raised the issue of abstention.[28] Even if the question of comparative authority had been less clear, it cannot be said that a federal court disrupts harmonious relations with a state by responding to a request by the bickering state agencies to resolve their dispute.

 In summary, then, an injunction to protect Southwest's federal judgment will not disrupt policies of federalism. The district court correctly declined to abstain in *Southwest I.* Abstention would not have been an appropriate response to the invocation by the state agencies themselves of federal court jurisdiction to resolve what turned out to be a clear question of state law. Because the original holding violated no principle of federalism, it deserves the protection of the federal chancellor. These facts reveal only one disruption of state-federal relations—the filing of *Austin* by the CAB carriers. Enjoining the state proceeding therefore removes, rather than exacerbates, discord between the sovereigns.[29]

---

27. *City of Meridian v. Southern Bell Tel. & Tel. Co.,* 1959, 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562, concerned the constitutionality of a tax statute under an ancient, rarely used state constitutional provision. In *United Gas Pipeline Co. v. Ideal Cement Co.,* 1962, 369 U.S. 134, 82 S.Ct. 676, 7 L.Ed.2d 623, the Louisiana License Code provision under which the state taxed national gas sales had not been construed by a state court. *Kaiser Steel Corp. v. W. S. Ranch Co.,* 1968, 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835, posed the "truly novel" question of the meaning of the term "public use" in the New Mexico Constitution's eminent domain provision. 391 U.S. at 594, 88 S.Ct. 1753. This Court held in *Romero v. Coldwell,* 5 Cir. 1972, 455 F.2d 1163, 1165:

> [A]ppellants contend that each justice of the peace has county-wide jurisdiction, and they acknowledge that this is the linchpin of their case. It appears that this is a question that is neither settled nor clear under Texas law.

And we also noted in *Barrett v. Atlantic Richfield Co.,* 5 Cir. 1971, 444 F.2d 38, 42, that no Texas court had ever attempted to reconcile conflicting claims for different minerals on the same land and that the legislature had not provided a solution either.

We must also reject appellants' attempt to apply *Louisiana Power & Light Co. v. Thibodaux,* 1959, 360 U.S. 25, 79 S.Ct. 1070, 3

L.Ed.2d 1058, *rehearing denied,* 360 U.S. 940, 79 S.Ct. 1442, 3 L.Ed.2d 1552, to the *Southwest* facts. Again the Court considered the law truly unsettled. *Id.* at 30, 79 S.Ct. 1070. Only through the specious legal argument of the appellants can Texas law on the comparative authority of the cities and the TAC be considered unclear. We have rejected that argument repeatedly and also reject their corollary use of *Thibodaux.*

28. Had the cities wanted a state court determination, they could have brought a suit in the Texas courts on both the federal and state grounds. If Southwest had then removed the case to federal court, the cities could have asked for abstention. Similarly, the TAC could have raised the abstention question after intervening.

29. Preventing this affront to the federal judgment will not preclude Texas courts from addressing the legal issues that underlie this dispute. *See* footnote 19. Under *Pullman* and its progeny, the resolution of legal issues in *Southwest I* does not bind the Texas judiciary on those questions of law. In this case, we hold only that the CAB carriers cannot assail a federal judgment by relitigation in state courts. If the Texas courts or legislature should establish legal rules incongruous with the legal princi-

## IV. PRECLUSION

An injunction to protect a federal judgment can restrain only those bound by the judgment.[30] Because the CAB airlines did not appear as parties in *Southwest I,* they now argue that the holding of that case cannot preclude them from relitigating issues there decided. They present the question whether the 1968 ordinance can be enforced by private parties against Southwest after a federal court has held public enforcement of the ordinance invalid.

### A. CHOICE OF LAW

■ Federal law of res judicata controls this case. Even though the holding of *Southwest I* relied on state law, the effect of the case on parties and nonparties presents a question of federal law distinct from the local issues decided. This conclusion is consistent with *Aerojet-General Corp. v. Askew,* 5 Cir. 1975, 511 F.2d 710, 715–718, *rehearing denied,* 514 F.2d 1072, *cert. denied* 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137, in which the Court held that the res judicata effect of a diversity judgment also depended upon federal law. *Aerojet* stressed the importance of preserving rights generated by federal judgments:

If state courts could eradicate the force and effect of federal court judgments through supervening interpretations of the state law of res judicata, federal courts would not be a reliable forum for final adjudication of a diversity litigant's claims.[31]

This reasoning applies *a fortiori* in a non-diversity setting where the *Erie* doctrine has even less force than in *Aerojet.*

### B. BACKGROUND

The principle of res judicata serves several policies important to our judicial system. By declaring an end to litigation, the doctrine adds certainty and stability to social institutions.[32] This certainty in turn generates public respect for the courts.[33] By preventing relitigation of issues, res judicata conserves judicial time and resources.[34] It also supports several private interests, including avoidance of substantial litigation expenses,[35] protection from harassment or coercion by lawsuit,[36] and avoidance of conflicting rights and duties from inconsistent judgments.[37]

■ Recognizing the importance of these policies, federal courts have repeated-

ples that controlled *Southwest I,* then relief from the federal judgment may be justified under Rule 60(b) of the Federal Rules of Civil Procedure. *See Glenn v. Field Packing Co.,* 1933, 290 U.S. 177, 54 S.Ct. 138, 78 L.Ed. 252; *Oliver v. Monsanto Co.,* S.D.Tex.1972, 56 F.R.D. 370, *aff'd,* 5 Cir. 1973, 487 F.2d 514; 7 Moore's Federal Practice ¶ 60.26[4] (1971); C. Wright and A. Miller, 11 Federal Practice and Procedure § 2283 (1973). Of course, we do not reach the 60(b) question today. But we do suggest that by allowing the federal courts to determine the continuing effectiveness of their judgments, the Rule provides an approach more consistent than the "frontal attack" launched by the CAB carriers in *Austin.*

**30.** The term "preclusion" denotes the principle of res judicata. Section 2283 cases have traditionally sustained injunctions only against parties bound by a judgment in a res judicata sense. *E.g. International Ass'n of Mach. & Aero. Wrkrs. v. Nix,* 5 Cir. 1975, 512 F.2d 125 (a party to the first action was bound by the judgment therein); *Donelon v. New Orleans Terminal Co.,* ·5 Cir. 1973, 474 F.2d 1108 (a party to the first action was bound by the

judgment therein); *Johnson v. Radford,* 5 Cir. 1971, 449 F.2d 115 (heirs of party to first suit were considered "in privity" with the deceased and therefore bound by the first suit); 1B Moore's Federal Practice ¶ 0.408[2], [3] (1965).

**31.** *Aerojet-General Corp. v. Askew,* 5 Cir. 1975, 511 F.2d 710, 716.

**32.** Semmell, *Collateral Estoppel, Mutuality and Joinder of Parties,* 68 Colum.L.Rev. 1457 (1968); Comment, *Nonparties and Preclusion by Judgment: The Privity Rule Reconsidered,* 56 Calif.L.Rev. 1098 (1968).

**33.** Comment, *supra* note 32, at 1099.

**34.** Semmell, *supra* note 32, at 1457; Vestal, *Res Judicata Preclusion: Expansion,* 47 So.Cal. L.Rev. 357, 379 (1974); Comment, *supra* note 32, at 1099.

**35.** Semmell, *supra* note 32, at 1457.

**36.** Comment, *supra* note 32, at 1099.

**37.** *Id.* at 1098, 1105.

ly held that judgments can bind persons not party to the litigation in question. *Chicago, Rock Island & Pacific Railway Co. v. Schendel,* 1926, 270 U.S. 611, 46 S.Ct. 420, 70 L.Ed. 757; *Heckman v. United States,* 1912, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820; *Aerojet-General Corp. v. Askew,* 5 Cir. 1975, 511 F.2d 710; *Dudley v. Smith,* 5 Cir. 1974, 504 F.2d 979, *rehearing denied,* 1975, 507 F.2d 1280; *Astron Industrial Associates, Inc. v. Chrysler Motors Corp.,* 5 Cir. 1968, 405 F.2d 958. At common law this preclusive effect extended only to those in privity with the parties. 1B Moore's Federal Practice ¶ 0.411[1] (1965). But federal cases have recognized that "privity" denotes a legal conclusion rather than a judgmental process.[38] Professor Vestal has explained:

> Thus, the term privity in itself does not state a reason for either including or excluding a person from the binding effect of a prior judgment, but rather it represents a legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close to afford application of the principle of preclusion.[39]

▮ Federal courts have deemed several types of relationships "sufficiently close" to justify preclusion. First, a non-party who has succeeded to a party's interest in property is bound by any prior judgments against the party. *Golden State Bottling Co. v. NLRB,* 1973, 414 U.S. 168, 179, 94 S.Ct. 414, 38 L.Ed.2d 388; *United States v. New York Terminal Warehouse Co.,* 5 Cir. 1956, 233 F.2d 238, 241. Second, a non-party who controlled the original suit will be bound by the resulting judgment. *Dudley v. Smith,* 5 Cir. 1974, 504 F.2d 979 (president and sole shareholder controls his

corporation); *Kreager v. General Electric Co.,* 2 Cir. 1974, 497 F.2d 468, *cert. denied,* 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95–96; *rehearing denied,* 419 U.S. 1041, 95 S.Ct. 530, 42 L.Ed.2d 319 (president and sole shareholder controls his corporation); *Astron Industrial Associates, Inc. v. Chrysler Motors Corp.,* 5 Cir. 1968, 405 F.2d 958 (parent corporation controls subsidiary). Third, federal courts will bind a non-party whose interests were represented adequately by a party in the original suit.[40] *Heckman v. United States,* 1912, 224 U.S. 413, 445–46, 32 S.Ct. 424, 434–35, 56 L.Ed. 820 (United States represents interests of American Indians); *Kerrison v. Stewart,* 1876, 93 U.S. 155, 160, 23 L.Ed. 843, 845 (trustee represents interests of beneficiaries); *Aerojet-General Corp. v. Askew,* 5 Cir. 1975, 511 F.2d 710 (state represents interests of a home-rule county); *Berman v. Denver Tramway Corp.,* 10 Cir. 1952, 197 F.2d 946 (local government represents interests of the public).

▮ Because res judicata denies a non-party his day in court, the due process clauses prevent preclusion when the relationship between the party and non-party becomes too attenuated. *Hansberry v. Lee,* 1940, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22; *cited with approval, Blonder-Tongue Laboratories v. University of Illinois Foundation,* 1971, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788. Although *Hansberry* involved a class action suit, its due process principles also control res judicata cases. In *Humphreys v. Tann,* 6 Cir. 1973, 487 F.2d 666, *cert. denied,* 1974, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 307, for instance, the Court permitted a plaintiff to sue the owner of an airplane involved in a mid-air collision even

---

**38.** Judge Prettyman found the concept elusive and concluded:

> It is sufficient that the word designates a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved.

*Jefferson School of Social Science v. Subversive Activities Control Brd.,* 1963, 118 U.S.App. D.C. 2, 331 F.2d 76; *accord, Bruszewski v. United States,* 3 Cir. 1950, 181 F.2d 419, 423,

(Goodrich, J., concurring) *cert. denied,* 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632.

**39.** Vestal, *Preclusion/Res Judicata Variables: Parties,* 50 Iowa L.Rev. 27 (1964).

**40.** Common law principles of res judicata classified many of these cases under the label of concurrent interest privity. The federal decisions have correctly disregarded the label and analyzed the representative relationship between the parties. *See* part IV E.

though an earlier suit had relieved the owner of liability. The first suit, to which the plaintiff was not a party, was not a class action. Even though the attorney for the plaintiff had participated in pretrial discovery and litigation conferences for the first trial, the Court of Appeals for the Sixth Circuit permitted him a separate day in court to try *his* theory of liability. *Id.* at 667, 671. The *Southwest* litigation also raises questions of both res judicata and due process.

## C. PRIVITY BY LETTER AGREEMENT

█ The district court decided to bind the CAB airlines by *Southwest I* in part because it found in the Letter Agreements a contractual privity between the airlines and Dallas. Although the opinion does not specify the nature of this privity, the concurrent rights established in the new airport by the Letter Agreements apparently form the basis of the relationship. Concurrent privity between private persons, as a

legal principle, is well established at common law,[41] but it does not apply to the facts before us. Section 85 of the *Restatement of the Law Second-Judgments* (tentative draft No. 2, 1975)[42] identifies the contractual and representative essence of the doctrine. The party trustee or administrator or executor in the suit represents the nonparty bondholder or beneficiary, who is to be bound by the judgment against the party. The lessor-lessee nexus created by the Letter Agreements is not included in the list of private representative relationships requiring preclusion.[43] Its absence results from the nature of most lessor-lessee agreements, which do not inherently provide a representative role to either party.[44] The CAB agreements do not indicate any intent to the contrary, as the signatories limited discussion to the scope and cost of the airport, use of it by the airlines, and rental charges. Consequently, the Letter Agreements do not create private contractual privity between Dallas and the CAB carriers.

**41.** 1B Moore's Federal Practice ¶ 0.411[12] (1965). *See Kersh Lake Dist. v. Johnson* (1940) 309 U.S. 485, 60 S.Ct. 640, 84 L.Ed. 881 (trustee under mortgage and deed of trust has concurrent interest in property with a secured bond holder); *McCrocklin v. Fowler,* E.D.Wisc.1968, 285 F.Supp. 41, aff'd. 7 Cir. 1969, 411 F.2d 580 (administrator of an estate has concurrent interest with a beneficiary).

**42.** Section 85 states:
(1) A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of the rules of res judicata as though he were party. A person is represented by a party who is:
(a) The trustee of an estate or interest of which the person is a beneficiary; or
(b) Invested by the person with authority to represent him in an action; or
(c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or
(d) An official or agency invested by law with authority to represent the person's interests; or
(e) The representative of a class or persons similarly situated, designated as such with the approval of the court, of which the person is a member.

(2) A person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process.

**43.** Furthermore, theories of successive relationships in the same property rights do not establish privity here; Dallas and CAB lines executed the Letter Agreements *before,* not after the judgment in *Southwest I. Radio Corp. v. Radio Eng. Lab.,* 1934, 293 U.S. 1, 54 S.Ct. 752, 79 L.Ed. 163, *rehearing denied,* 293 U.S. 522, 55 S.Ct. 66, 79 L.Ed. 634; *see Kruger & Birch, Inc. v. Du Boyce,* 3 Cir. 1957, 241 F.2d 849, 854 (lessee held in privity with lessor as to issue litigated *before* the lease); 1B Moore's Federal Practice ¶ 0.411[1] nn. 13–20 (1965); 46 Am. Jur.2d § 533 (1969).

**44.** As the comment to Section 85 suggests, the private representative role is extended only to those whom the parties intended, either expressly or impliedly, to exercise it:
The method of designating the representative may be adjudicative or contractual . . . . In any case, however, the effect is to confer on the representative the requisite authority, and generally exclusive authority, to participate as a party on behalf of the represented person.

## D. VIRTUAL REPRESENTATION

Southwest and the district court, citing *Aerojet*,[45] partly rely on the doctrine of virtual representation to bind the CAB airlines. This doctrine offers little analytical assistance here because of its wide and inconsistent application. In *Aerojet* most of the cases cited represent factual settings with little relevance to the Southwest dispute because they involved only private parties: estate beneficiaries bound by administrators,[46] presidents and sole stockholders by their companies,[47] parent corporations by their subsidiaries,[48] and a trust beneficiary by the trustee.[49] In fact, the doctrine closely resembles the theory of concurrent privity which our Court, as noted, has rejected. Although Southwest argues that the representation of private interests by government agencies comprises one branch of the doctrine, the proposition bears little relation to the primary question about the propriety of barring the private interests from relitigation.[50] Federal case law requires that we direct our analysis toward answering that specific question,

rather than toward identifying the doctrinal scope of virtual representation.[51] Consequently, we turn to the relationship between the government agency that litigated *Southwest I* and the private parties that would relitigate the same issues in *Austin*.

## E. REPRESENTATION BY GOVERNMENT AUTHORITIES

In their attempt to apply the 1968 Bond Ordinance to Southwest, the CAB airlines assume the role of private attorneys-general. In effect, they would enforce the ordinance's phase-out provision by excluding Southwest from Love Field. The City of Dallas has already failed in its attempt to effect such an exclusion. We hold that the carriers should be bound by that failure.

As noted above, res judicata does not follow here· from concurrent privity or the theory of virtual representation. Successive privity does not apply, because the carriers did not succeed to the interests of Dallas at Love Field. Nor did the airlines

**45.** 511 F.2d at 719.

**46.** *Chicago R. I. & P. Ry. Co. v. Schendel,* 1926, 270 U.S. 611, 46 S.Ct. 420, 70 L.Ed. 757; *Robison v. Sidebotham,* 9 Cir. 1957, 243 F.2d 16, *cert. denied,* 355 U.S. 867, 78 S.Ct. 115, 2 L.Ed.2d 74.

**47.** *Dudley v. Smith,* 5 Cir. 1974, 504 F.2d 979; *Kreager v. General Electric Co.,* 2 Cir. 1974, 497 F.2d 468.

**48.** *Pan American Match, Inc. v. Sears, Roebuck and Co.,* 1 Cir. 1972, 454 F.2d 871, *cert. denied,* 409 U.S. 892, 93 S.Ct. 113, 34 L.Ed.2d 149; *Astron Indus. Associates, Inc. v. Chrysler Motors Corp.,* 5 Cir. 1968, 405 F.2d 958.

**49.** *Kerrison v. Stewart,* 1876, 93 U.S. 155, 23 L.Ed. 843. One cited case did involve representation by a government. *Heckman v. United States,* 1912, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820. The res judicata effect was a function of the substantive federal law on the relationship between the federal government and American Indians.

**50.** The importance of the proposition diminishes further because of the confusion surrounding the doctrine. Although in one Texas case courts expressly involved the theory to bar private parties from relitigating issues already decided in a government suit, *Cochran*

*County v. Boyd,* Tex.Civ.App. 1930, 26 S.W.2d 364, other Texas cases analyze similar situations without reference to the doctrine. *Hovey v. Shepard,* 1912, 105 Tex. 237, 147 S.W. 224; *City of Palestine v. City of Houston,* Tex.Civ. App. 1924, 262 S.W. 215. The commentators also do not agree on the essence of the doctrine. One has stressed the special legal relationships that traditionally have existed between the party and the represented non-party. Comment, *The Expanding Scope of the Res Judicata Bar,* 54 Tex.L.Rev. 527 (1976). Another has emphasized the element of necessity, which requires the application of res judicata when non-parties could not possibly have been joined in the original action. Comment, *Non-Parties and Preclusion by Judgment: The Privity Rule Reconsidered,* 56 Calif.L.Rev. 1098 (1968), *citing* Restatement of Judgments § 87 (1942).

**51.** *See Battle v. Cherry,* N.D.Ga.1972, 339 F.Supp. 186, holding that a suit by a school board to enforce a state educational program binds taxpayers and parents of school children. *See also Smith v. Illinois Bell Tel. Co.,* 1926, 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747; *In Re Engelhard & Sons Co.,* 1914, 231 U.S. 646, 34 S.Ct. 258, 58 L.Ed. 416, both involving the representative capacity of a public utility.

in any sense control the litigation in *Southwest I.* On the facts of this case, however, res judicata applies because Dallas, as a government, represented in *Southwest I* the only legal interests the airlines possess regarding the enforcement of the 1968 ordinance against Southwest. In other words, the relationship between the city as public enforcer of the ordinance and the airlines as private enforcers is close enough to preclude relitigation.

■ Although the doctrine of "virtual representation" seems cloudy, the proposition that governments may represent private interests in litigation, precluding relitigation, is clear. In *Berman v. Denver Tramway Corp.,* 10 Cir. 1952, 197 F.2d 946, for instance, a citizen and taxpayer could not challenge the tramway fares once the city had already lost a suit on the issue.[52] Similarly in *Battle v. Cherry,* N.D.Ga.1972, 339 F.Supp. 186, the court refused to allow parents to enforce a state law once their school board had already failed to achieve enforcement.[53] On the other hand, this Court has recently held that litigation by a government agency will not preclude a private party from vindicating a wrong that arises from related facts but generates a distinct, individual cause of action. In *Rodriguez v. East Texas Motor Freight,* 5 Cir. 1974, 505 F.2d 40, *cert. granted,* 1976, 425 U.S. 990, 96 S.Ct. 2200, 48 L.Ed.2d 814, Mexican-American drivers charged their employer with job discrimination in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, and 42 U.S.C. § 1981. Before the termination of that suit, the United States challenged similar discrimination in a nation-wide "pattern and practice" suit and procured a consent decree

with guidelines for future hiring and optional remedies for individual workers. 505 F.2d at 65. The individual remedies, however, were not complete and did not consider the specific discrimination against any employee. The government therefore could not assure that the general, nationwide remedies could actually vindicate the damage suffered by individuals. This Court allowed the individual plaintiffs to continue their private actions. As the leading case in support of the decision, *Williamson v. Bethlehem Steel Corp.,* 2 Cir. 1972, 468 F.2d 1201, *cert. denied,* 1973, 411 U.S. 931, 93 S.Ct. 1893, 36 L.Ed.2d 390, reasoned, the Civil Rights Acts intend to bestow on individual employees legal rights distinct from the more general public interests vindicated by government suits. Employers therefore may be subject to liability for violation of legal duties owed the public as well as for violation of distinct legal duties owed individual employees. Furthermore, to correct the individual injustices, the statutory scheme contemplates private remedies different from those available to the Justice Department.

Despite these cases, the federal judiciary has never faced the precise question posed by the instant facts. The CAB carriers correctly distinguish *Berman* by arguing that their pecuniary interest in the success of the new airport, surpasses the interests possessed by members of the general public or taxpayers. If Southwest directs business away from the new facility, the other airlines will face higher per flight landing charges, which could damage their competitive positions in the Dallas-Fort Worth market. Members of the general public or tax-

---

**52.** In *Berman* the court cited *In Re Engelhard & Sons Co.,* 1914, 231 U.S. 646, 34 S.Ct. 258, 58 L.Ed. 416. That was a case in which the Supreme Court refused to allow a private party to intervene in a suit between a city and the local telephone company. The Court assumed that the city would vigorously pursue the action and would therefore adequately represent both the public and the subscribers to phone service. Although this case does not identify the type of relationship necessary for res judicata, it does deny a day in court both to members of the public and to private persons with pecuniary interests in the dispute.

**53.** Several states have adopted similar positions, including Texas, where citizens could not sue to prevent a railroad from moving its facilities once their city had already lost an identical suit. *See Hovey v. Shepard,* 1912, 105 Tex. 237, 147 S.W. 224, *cited with approval, City of Palestine v. City of Houston,* Tex.Civ.App. 1924, 262 S.W. 215, holding that a city could properly represent its citizens' interests in litigation over the movement of railroad facilities.

payers would suffer no corresponding risk because they have assumed no responsibility to finance the airport. On the other hand, Southwest is on sound ground in arguing that the CAB carriers have not suffered a private legal wrong independent from the violation of the ordinance. Consequently, their condition differs from that of the job discrimination victims who could claim that under the Civil Rights Acts the employers had breached legal duties owed specifically to them, not just to the general public. Furthermore, in *Rodriguez* and *Williamson* the workers claimed remedies distinct from the relief imposed in the government litigation. In the *Southwest* case, however, the CAB airlines attempt only to exclude Southwest from Love Field, the remedy already denied the City of Dallas. The carriers do not claim any other recovery from Southwest because Southwest owes no legal duty apart from the general responsibility to obey valid public ordinances. So this case falls between *Berman* and *Rodriguez,* and requires us to refine the preclusive effect of government litigation.[54]

The American Law Institute has recently completed such a refinement in its Restatement of the Law Second-Judgments § 85 (tentative draft No. 2, 1975). The comment to subsection 85d analyzed representation by public officials through three categories. First, it recognizes that private suits to vindicate public interests raise standing issues. Second, it establishes a category of cases in which "an agency's authority to maintain or defend litigation . . . should be construed as preempting the otherwise available opportunity of the individual or members of the public to prosecute . . .." Third, it recognizes cases such as *Williamson* in which "remedies that a public official is empowered to pursue may be interpreted as being supplemental to those which private persons may pursue themselves. In that circumstance, the official's maintenance of an action does not preclude other litigation by the persons affected."

The reporter's note on subsection 85d includes no federal cases in support of the second category,[55] and most of the state cases do not present facts analogous to the case at hand.[56] In *Rynsburger v. Dairymen's Fertilizer Cooperative, Inc.,* Ct. of App.1968, 266 Cal.App.2d 269, 72 Cal.Rptr. 102, however, the court precluded landowners from litigating a nuisance action similar to one prosecuted by the public authorities.

**54.** Despite the urging of the appellants, *E. B. Elliott Advertising Co. v. Metropolitan Dade County,* 5 Cir. 1970, 425 F.2d 1141, *cert. denied,* 400 U.S. 805, 91 S.Ct. 12, 27 L.Ed.2d 35, cannot assist in the refinement. In *Elliott* a private plaintiff challenged the constitutionality of a city ordinance after another private litigant had lost a similar challenge. The question was whether in the first suit the *private litigant* had represented the interests of the later challenger. Representation by a government authority never came up because both of the private parties *opposed* the city. As a result, the case has no bearing on the *Southwest* litigation, in which the later private litigants support, not oppose, the government position thereby raising the question of whether the government represented their interests in the earlier suit.

**55.** The reporter did cite *Patterson v. Burns,* D.Haw.1971, 327 F.Supp. 745, as precedent against preclusion in category two cases. In that case the court permitted a private citizen to challenge the appointment of a senator to fill a vacancy even though the lieutenant governor had previously challenged the appointment. Because of its unusual facts, however, the case differs from the others in the category. The lieutenant governor had not adequately represented the private litigant because he merely tested a state law interpretation of his election rules. The private citizen, on the other hand, claimed that the appointment violated his constitutional right to equal protection of the laws, an issue never raised in the first suit. *Patterson* therefore cannot apply to the *Southwest* case in which the private litigant raises precisely the same legal claim litigated by the public agency.

**56.** In *Stuart v. Winslow Elementary School Dist. No. 1,* 1966, 100 Ariz. 375, 414 P.2d 976; and *Greene v. Art Institute of Chicago,* 1957, 16 Ill.App.2d 84, 147 N.E.2d 415, *cert. denied,* 1958, 358 U.S. 838, 79 S.Ct. 62, 3 L.Ed.2d 74, members of the public were precluded from relitigating issues previously tried by public authorities. Because the private parties claimed no interest in the outcome besides their interests as citizens and taxpayers, perhaps they lacked standing to sue. See 147 N.E.2d at 418. Viewed in this manner, *Berman* may be properly classified in class one rather than class two.

The landowners alleged individual harms to their property and could have argued that the nuisance statutes established a scheme to protect both their rights and public interest. After concluding that the landowners had advanced a public nuisance theory of recovery, however, the court bound them to the previous judgment on the same theory.[57] Again, in *Town of Burnsville v. City of Bloomington,* 1962, 264 Minn. 133, 117 N.W.2d 746, the litigation of the validity of an annexation by a municipality barred the affected landowners from trying a similar case. *Id.* at 754. Although the court did not discuss the difference between the landowners and the general public, the landowners could have argued that including their property in a jurisdiction with higher taxes and different municipal services inflicted a special pecuniary injury not experienced by the public. Yet the state court refused to permit them a day in court. Consequently, under the Restatement Second system of preclusion, a private party must show more than a special pecuniary interest when attempting to vindicate the breach of a public duty already litigated by a government agency. Permission to relitigate appears reserved for the private plaintiff who would vindicate a breach of duty owed specifically to the plaintiff or who would recover under a "statutory system of remedies [that] may contemplate enforcement of private interests both by a public agency and the affected private parties." Restatement of the Law Second-Judgments § 85 (1975) (Reporter's Note to comment d).

To apply the *Restatement* categories to this case, the standing of the CAB carriers to sue Southwest has not been challenged. The issue before us is whether the case falls within category two, in which government litigation precludes private relitigation or category three, in which the relitigation could occur. The facts here best fit the second category of the *Restatement.* First, the CAB carriers do not claim a breach of legal duty by Southwest, apart from the alleged violation of the general duty to obey valid ordinances. Second, the carriers request the same remedy denied the City of Dallas, namely the enforcement of the phase-out provision of the ordinance to exclude Southwest from Love Field. Third, the ordinance does not establish a statutory scheme looking toward private enforcement of its requirements. Because legal interests of the carriers do not differ from those of Dallas in *Southwest I,* we hold that they received adequate representation in the earlier litigation and should be bound by the judgment in that litigation.[58]

We have adopted the *Restatement* approach because it promotes the policies of res judicata in this factual setting. To allow relitigation by any private litigant with a pecuniary interest in the success of the new airport would open the door to recurrent, burdensome litigation. Besides the CAB carriers, all of the individuals and companies that provide goods and services at the new airport have a pecuniary interest, distinct from that of the general public, not only in the ultimate survival of the facility, but also in the volume of air traffic attracted to the airport. More planes means more passengers, more sales, more jobs, more profits for all of the businesses

57. In *Rynsburger* the court also supported preclusion by a modified class action analysis. The earlier suit by the public authority included other landowners as plaintiffs. Thus, the later plaintiffs were represented in the first action not only by the government but also by similarly situated landowners. In *Southwest I,* several of the CAB airlines also participated, but only by filing amicus briefs.

58. The appellants argue that the interests of Dallas and the CAB carriers differ over whether Love Field should close. They submit that Dallas prefers to retain commercial service at Love Field as a convenience to its citizens, whereas the carriers prefer closing Love Field. The argument lacks force because it does not examine the congruence of their legal interests. Both Dallas and the carriers are attempting to enforce the ordinance and to overturn TAC authority over intrastate air services, thereby giving Dallas control of access to Love Field. Furthermore, the argument neglects the presence of Fort Worth and the Airport Board as Dallas's coparties in *Southwest I.* The alliance of the two cities and the Board indicates the frivolity of the suggestion that the representation by these government authorities somehow betrayed the carriers' interest in the success of the new airport.

involved. Furthermore, a pecuniary interest could be claimed by investors, developers, hotels, restaurants, and other retail interests attracted to the vicinity by the new facility. Even the businesses at or near Love Field could claim a similar, although converse, interest. To allow relitigation by all of these parties would surely defeat the res judicata policies identified above. First, it would add uncertainty to the status not only of Southwest but also of the other businesses and government operations. If courts could second guess another court each time a new litigant, dissatisfied with the previous judgment, filed a new complaint, the respect of the previous parties or of the public toward the courts would inevitably decrease. Third, relitigation would continue to waste judicial resources and time, as it has already in the three post-judgment suits in this controversy. Fourth, Southwest and subsequent litigants would suffer the harassment and expense of still later lawsuits, as well as the possibility of numerous conflicting judgments. Although these horrors may not occur, we see no reasoned basis on which to distinguish the CAB airlines from numerous parties with pecuniary interests in the Southwest controversy. We can best support the public interest by applying the *Restatement's* approach to preclude relitigation by all persons, including the carriers, who claim nothing more than a pecuniary interest in the dispute.

### F. DUE PROCESS

Appellants submit that binding them by the judgment in *Southwest I* violates due

process of law because it denies them a day in court. Their argument arises from the landmark case of *Hansberry v. Lee*, 1940, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 [59] in which the Court addressed the preclusive effect of a class action suit. The original suit in *Hansberry* upheld the validity of a racially restrictive covenant in a series of property deeds. The covenant's validity depended upon whether the owners of ninety-five per cent of the frontage of the property had signed the agreement. The litigants in the first suit stipulated the collection of a sufficient number of signatures. In a later action to enforce the covenant, however, the Court allowed the defendants to assail the validity of the agreement despite the earlier judgment. According to the Court, "there has been a failure of due process only in those cases where it cannot be said that the procedure adopted fairly ensures the protection of the interests of absent parties who are bound by it." 311 U.S. at 42, 61 S.Ct. at 118. After adopting a case by case approach to examining the procedural protection,[60] the Court held that preclusion on the facts of *Hansberry* violated due process. Not only were the defendants not parties or common law privies to the first action, but also their legal interests were not represented by the property owners who led the first class. The property owners in the first suit attempted to uphold the covenant while the defendants tried to invalidate it. Consequently, the class represented legal interests in direct opposition to the position of the defendants.

An analysis of the facts before this Court demonstrates that due process will

---

**59.** *Hansberry* retains its vitality, as indicated by the Supreme Court's approving citation in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 1971, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788.

**60.** Several student commentaries have recently suggested that this case by case due process consideration should dominate the analysis of res judicata questions. *See* Comment, *Non-Parties and Preclusion by Judgment: The Privity Rule Reconsidered,* 56 Calif.L.Rev. 1098, 1132, 1968; Note, *Collateral Estoppel of Non-Parties,* 87 Harv.L.Rev. 1485, 1500; Note, *The Expanding Scope of the Res Judicata Bar,* 54

Texas L.Rev. 527, 528, 534 (1976). These commentators suggest a balancing of due process factors: participation by the precluded party in the prior proceeding through intervention, combined discovery, amicus submissions, presence of counsel at hearings, testifying as a witness, advising previous parties; the extent of congruence between the legal interests and positions of the party to the earlier suit and those of the precluded party; the quality of representation of the precluded party's interests; the burdens relitigation poses to the judicial system; the costs and harassment that relitigation poses to parties.

not be violated by binding the CAB carriers to the judgment in *Southwest I.* Even though they were not parties to that action and have never presented evidence on the validity of the 1968 Ordinance, their interests were sufficiently represented by the public authorities to guarantee due process. Most importantly, their legal interests precisely coincide with those of the cities and the regional airport board. All of them assert that the TAC cannot thwart the phase-out provision of the ordinance. The situation presented in *Hansberry,* therefore, is not presented here. The appellants assert the contrary by arguing that the interests of the cities in *Southwest I* differs from the pecuniary interests of the carriers. This argument misreads *Hansberry,* a case that looks to the congruence of the legal interests of the parties and non-parties not to their financial stake in the litigation. The pecuniary interest of the airlines is legally immaterial to the judgment of *Southwest I* as affirmed by this Court. The judgment addresses the validity under Texas law of the 1968 ordinance, and on that issue no conflict exists between the cities and the CAB carriers.

The quality of the plaintiffs' litigation in *Southwest I* also satisfies due process. A review of the record in that case reveals that the plaintiffs lost their suit only because both the district and appellate courts found the Texas law to be clearly against them.[61] The CAB carriers have not demonstrated, nor can we find, any deficiency in the performance of the plaintiffs' counsel. Consequently, this factor adds no weight that could tip the scales towards finding a violation of due process.

Several other factors also cut against finding a violation. First, the district court found as a matter of fact that lawyers for the CAB carriers closely followed all of the Southwest litigation and attended the various hearings in the cases. Second, three of the airlines submitted amicus briefs to this Court in *Southwest I.* Their views on the state law issues therefore received full consideration. Third, the due process balance must include the damage relitigation would visit upon the judicial system and Southwest. As discussed above,[62] relitigation would constitute a blatant disregard for the decision of this Court and for the judgment of the federal district court in *Southwest I.* It would damage the public's interest in the most efficient allocation of judicial resources in both the state and federal systems of justice. It would impose substantial relitigation costs upon Southwest. It would threaten the rights granted Southwest by the *Southwest I* judgment. And finally, it would subject Southwest to the possibility of conflicting judgments.

Denial of the opportunity to bring a suit raises a serious due process question. We conclude, however, that the factors against allowing the carriers to sue outweigh the carriers' interests in relitigation. Preclusion of their private enforcement of a public ordinance does not violate due process when their legal interests were more than adequately represented by the public authorities that promulgated the ordinance and had the primary responsibility to enforce it.

## V. CONCLUSION

This is the eighth time in three years that a federal court has refused to support the eviction of Southwest Airlines from Love Field. Precisely worded holdings and deference to state authorities by the federal judiciary have only generated more suits, appeals, and petitions for rehearings. Once

---

**61.** A commentator has criticized the district court decision in this case in part because "the quality of the representation of the absent parties claims was left purely to chance. . . . This procedure hardly satisfies the principles inherent in the constitutional guarantee of due process." 54 Tex.L.Rev. at 543. This argument disregards the perspective from which the due process judgment is made. To the extent that quality of representation is a factor in the due process balance, its weight corresponds to the *actual* quality of litigation demonstrated in the first trial. We see nothing in the record of the *Southwest I* to indicate any inadequacy in the advocacy of the plaintiffs' counsel.

**62.** *See* text at notes 22–23.

again, we repeat, Southwest Airlines Co. has a federally declared right to the continued use of and access to Love Field, so long as Love Field remains open. The narrowly drawn preliminary injunction of the district court correctly protects that right. It does so without violating principles of federalism, the federal law of res judicata, or the dictates of due process.

The judgment of the district court is

AFFIRMED.