43 F.3d 1054
 Fed. Sec. L. Rep. P 98,976, 31 Fed.R.Serv.3d 91,
1995 Fed.App. 9P
 Richard C. BECHERER; Lawrence Milton Richard; Robert A.
Horvath; Shirley L. Horvath; Henry V. Denolf;
and Joann L. Denolf,
(93-1050/1051/1221),
Plaintiffs-
Appellants,
Cross-Appellees,
J. Don Adams, et al., (93-1052/1164), Proposed Intervenors,
Appellants, Cross-Appellees,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; Frank Lavin;
Martin Cicco; Laventhol & Horwath; M.A. Mortenson Co.;
Winsor/Faricy Architects, Inc.; Trustbank Mortgage Center,
Inc., formerly known as Dominion Financial & Investment
Corp.; and Midwest Title Guarantee Company of Florida,
Defendants-Appellees,
Can-American Corporation; Can-American Realty Corporation;
Shelter Seagate Corporation; Garrett G. Carlson; Graham C.
Lount; and Arni Thorsteinson, (93-1049),
Defendants-Appellees, Cross-Appellants.
 Nos. 93-1049 to 93-1052, 93-1164 and 93-1221.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 26, 1994.
Decided Jan. 10, 1995.
Rehearing and Suggestion for Rehearing En Banc
Denied April 11, 1995.
 
 Elwood S. Simon (argued and briefed), John P. Zuccarini (briefed), Bloomfield Hills, MI, Bruce E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, New York City, and Eugene A. Spector, and Robert M. Roseman, Spector & Roseman, Philadelphia, PA, for plaintiffs.
 Michael W. Pettit and Thomas R. Grady (argued and briefed), Naples, FL, for appellant.
 Dennis K. Egan (argued), Douglas G. Graham (briefed), Butzel, Long, Gust, Klein & Van Zile, Detroit, MI, David C. Andrew (briefed), Washington, DC, Jon B. Gandelot, Gandelot & Dickson, Detroit, MI, Mary C. Yeager (briefed), Faegre & Benson; Steve Gaskins (argued and briefed), Minneapolis, MN, Stephen F. Wasinger, Raymond W. Henney, Honigman, Miller, Schwartz & Cohn, Detroit, MI, Lawrence A. Hurlburt, Van Benschoten, Hurlburt, Tsiros & Allweil, Saginaw, MI, Thomas G. McNeill, Lawrence G. Campbell, Michael S. Daar, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI, Jeanne M. Forneris, Minneapolis, MN, Robert P. Hurlbert, Chicago, IL, James R. Case, Melissa Horne, Kerr, Russell & Weber; Jonathan T. Walton, Jr. (argued and briefed), Clark, Klein & Beaumont; Lawrence R. Donaldson, Kelly A. Freeman (argued and briefed), Plunkett & Cooney; Charles G. Goedert, Timothy D. Wittlinger, Hill, Lewis, Adams, Goodrich & Tait, Detroit, MI, and Maura D. Corrigan, Robinson & McEwee, Lexington, KY, for defendants.
 Susan LaCava (briefed), Madison, WI, for amicus curiae.
 Before: KEITH, KENNEDY, and SUHRHEINRICH, Circuit Judges.
 KENNEDY, Circuit Judge.
 
 
 1
 This complicated commercial litigation arises out of the construction and sale of unit interests in a resort hotel. Plaintiffs are investors in the hotel and have filed suit against the hotel's developers, as well as against the broker, the escrow agent, and the financial institution involved in the sale of the hotel. The District Court held a bench trial on one of the contract claims and disposed of the balance of the contract, statutory, and fraud claims by granting several motions to dismiss and motions for summary judgment. The parties now appeal, challenging various aspects of the District Court's procedural and substantive rulings.
 
 I.
 
 2
 We need first to identify the parties involved in this litigation. While plaintiffs are all investors in the hotel, we have before us two groups of plaintiffs. The District Court certified the two groups as a class only as to two contract claims against Shelter Seagate Corporation (hereinafter "SSG").[1] The named plaintiffs (hereinafter "Becherer plaintiffs") are a group of investors who filed suit in the United States District Court for the Eastern District of Michigan and who sought to have their suit certified as a class action. The group of investors referred to in our case caption as "J. Don Adams, et al." (hereinafter "Florida plaintiffs") contend that, with the exception of the class contract claims, they are not bound by the District Court's decisions and should be able to pursue their own action in Florida state court.
 
 
 3
 SSG is the entity responsible for the development, construction, and operation of the hotel. SSG is affiliated with Can-American Corporation and Can-American Realty Corporation. All three corporations are owned by Garrett Carlson, Graham Lount, and Arni Thorsteinson.
 
 
 4
 Merrill Lynch, Pierce, Fenner & Smith, Inc. acted as the exclusive selling agents for the hotel interests. TrustBank Mortgage Center, Inc. (hereinafter "TMC"), formerly known as Dominion Financial & Investment Corporation, approved potential investors and provided financing for some of the investors. TMC is now in receivership and is operated by the Resolution Trust Corporation. Midwest Title Guarantee Company of Florida (hereinafter "Midwest") acted as agent for the closing escrow account.
 
 II.
 
 5
 SSG incorporated in December 1983 for the purpose of developing and constructing The Registry Hotel, a nonresidential, luxury condominium resort complex at Pelican Bay in Naples, Florida. SSG raised money to finance the hotel by selling interests in the hotel through a private placement. Between February 1984 and April 1985, investors entered into contracts with SSG for the purchase of hotel units. Each hotel unit cost between $179,500 and $278,000 and included a fully furnished hotel room or suite, a percentage interest in the hotel's common areas, and a percentage interest in the hotel's future profits. The investors appointed SSG as their agent, authorizing it to rent hotel units, collect pool revenues, pay operating expenses, and distribute cash dividends to the investors at regular intervals.
 
 
 6
 Merrill Lynch acted as the exclusive selling agent for the hotel interests and provided potential investors with a Private Placement Memorandum (hereinafter "PPM"), which described the offering in detail. The purchase agreement between SSG and each investor is set forth in a document entitled "Unit Sale Agreement," and in other documents incorporated by reference therein. To "subscribe" for a hotel interest, each prospective investor submitted to Merrill Lynch an executed Unit Sale Agreement, a ten percent down payment, and various documents related to financing the balance of the purchase price. Merrill Lynch held the Unit Sale Agreements and the down payments in an interim escrow account, pending the fulfillment of certain conditions. According to the terms of the offering, Merrill Lynch was to turn the contents of the interim escrow account over to Midwest only after these conditions were satisfied. Midwest was to then place the documents in the closing escrow account until the closing of the sale.
 
 
 7
 Investors were free to cancel their purchase agreements until two conditions were fulfilled:[2] Merrill Lynch received subscriptions for all units and TMC approved each investor for financing. It took eight and one-half months to obtain subscriptions for all the interests and another three and one-half months for TMC to approve investors' mortgage applications. In these latter three and one-half months, some investors withdrew and were replaced.
 
 
 8
 The interim escrow account closed on February 15, 1985, at which time the investors became obligated to complete their purchases. Consequently, under the terms of the contract, SSG had until February 15, 1987 to substantially complete the hotel and close the sale. Because SSG elected to close the sale on October 31, 1986, the District Court found that SSG waived whatever time remained in the two-year completion period and obligated itself to deliver a substantially complete hotel by the closing date, October 31, 1986. The District Court also found that SSG did not fulfill its requirements, as the hotel was not substantially complete at the time of closing.
 
 
 9
 The procedural history of the case, as well as additional pertinent facts, will be discussed where appropriate.
 
 III.
 Issues Regarding Pretrial Procedure
 A. Discovery
 
 10
 In their factual and procedural history section, the Becherer plaintiffs drop a footnote to comment that the District Court denied them the opportunity to take discovery of Laventhol & Horwath, the accounting firm retained by SSG. This issue was not, however, raised in either the statement of issues or the argument sections of their brief. Thus, it has not been properly raised before this Court, and we will not address it. See United States v. Lanier, 33 F.3d 639 (6th Cir.1994).
 
 
 11
 B. Requirement that Plaintiffs Replead Fraud Claims as
 
 Breach of Contract Claims
 
 12
 The District Court, acting pursuant to its powers under Fed.R.Civ.P. 16,[3] held an initial status conference on April 23, 1990. The Becherer plaintiffs challenge two actions arising out of that conference. First, they allege that the District Court violated their substantive rights by forcing them to forego valid fraud claims and to replead their claims under a breach of contract theory. This allegation is patently meritless. The District Court did not require that the Becherer plaintiffs forego their fraud claims. Indeed, a review of the District Court's opinion shows that the court addressed both the breach of contract and the fraud claims. Because the Becherer plaintiffs continued to pursue their fraud claims after amending their complaint, we cannot see how they suffered any prejudice.
 
 
 13
 At the pretrial conference, the court also categorized all of the Becherer plaintiffs' claims into three areas of fraud:
 
 
 14
 1) whether the offering materials fraudulently omitted the true identity and competitive impact of a proposed Ritz-Carlton hotel;
 
 
 15
 2) whether defendants fraudulently leased [furniture, fixtures, and equipment]; and
 
 
 16
 3) whether defendants fraudulently closed on the sale of the hotel interests.
 
 
 17
 In a footnote in their factual section, the Becherer plaintiffs claim they identified a fourth area of fraud, which the District Court ignored: whether defendants fraudulently extended the offering after they told the investors that the investors were irrevocably bound because the offering had been fully subscribed. It is far from clear that this issue was pursued in the district court. In addition, the Becherer plaintiffs did not raise this issue in either the statement of issues or the argument sections of their brief. It is subsumed somewhat in their issue regarding the "breach of interim escrow duties" claim. Thus, to the extent it is raised, we will address it under that issue. To the extent it is not part of that claim, it has not been properly raised before this Court, and we will not address it. See United States v. Lanier, 33 F.3d 639 (6th Cir.1994).
 
 IV.
 Issues Regarding Closing of Sale Claims
 
 18
 A. Dismissal of Contract Claims for Failure to Prove Damages
 
 
 19
 The District Court held a bench trial on one of the Becherer plaintiffs' breach of contract claims against SSG. In that claim, the Becherer plaintiffs alleged that SSG violated the Unit Sale Agreements by closing the sale on the hotel before it was substantially complete. At the trial, the Becherer plaintiffs presented the testimony of Phillip Levin, a management consultant, to support their contention that the hotel lost money due to the delay in substantial completion.
 
 
 20
 After reviewing the evidence presented, the District Court found that SSG closed the sale before the hotel was substantially complete, and thus, breached the Unit Sale Agreements. After reaching this conclusion, the District Court reviewed Levin's testimony and Florida law on calculating damages. On the basis of this law and evidence, the District Court concluded that the plaintiff class had not carried "their burden of proving that they were damaged as a result of the aforementioned breaches." Becherer v. Merrill Lynch, Pierce, Fenner & Smith, 799 F.Supp. 755, 766 (E.D.Mich.1992). The hotel was completed before the two years expired, and opening it early enabled it to make a profit during that interim period. The District Court was not clearly erroneous in finding that the plaintiff class was not damaged by this breach.
 
 
 21
 The Becherer plaintiffs argue that the District Court had announced it was only trying liability, not damages, so they did not present proofs on the issue of damages. According to the Becherer plaintiffs, this was an improper modification of the pretrial order. This claim cannot succeed. Regardless of what the District Court might or might not have said in pretrial conferences, the fact remains that the Becherer plaintiffs presented evidence, in the form of expert testimony, regarding their damages. On appeal, they have not pointed to any damages evidence that they were unable to present. Accordingly, the District Court did not violate their substantive due process rights.
 
 B. Denial of Rescission Remedy
 
 22
 The Becherer plaintiffs also take issue with the District Court's refusal to allow rescission as a remedy for SSG's breach. The Becherer plaintiffs argue that the District Court reneged on its pretrial representations that they would be entitled to rescission of their investments if they proved a breach of contract. In support of their contention, they point to the District Court's November 1990 opinion, as well as comments made at the May 7, 1991 pretrial conference.
 
 
 23
 We have reviewed the District Court's November 1990 opinion, and it contains no implication, let alone an explicit promise, that Becherer plaintiffs would be entitled to rescission if they established a breach of contract. In any event, it does not matter what the District Court might or might not have indicated in anticipation of the trial on this issue. What matters is whether the District Court's decision not to allow rescission was erroneous.
 
 
 24
 The Becherer plaintiffs argue that section 8 of the Unit Sale Agreement specifically allows them to choose rescission as a remedy for breach. SSG and Merrill Lynch dispute this contention. It is clear as a matter of Florida law that the Becherer plaintiffs are not entitled to rescission of the contract simply because SSG closed on the sale prematurely:
 
 
 25
 [A]lthough as a general rule parties to a contract may strictly enforce its terms and the courts will not rewrite an agreement to undo the consequences of a bad bargain, ... the Florida courts do not blindly sanction unilateral termination of contracts when a default causes no harm to the party seeking to avoid performance.
 
 
 26
 Consistent with this principle, the Florida courts have indicated that the materiality of a breach is relevant when a party seeks to terminate or rescind a contractual relationship.
 
 
 27
 Burger King Corp. v. Mason, 710 F.2d 1480, 1490 (11th Cir.1983), cert. denied, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984) (citations omitted).
 
 
 28
 To further support their rescission argument, the Becherer plaintiffs note that the District Court found that SSG had breached the Unit Sale Agreement by leasing furniture, fixtures, and equipment (hereinafter "FF & E"). According to the Becherer plaintiffs, this material breach was enough under section 8 to allow them to rescind the contract. Section 8, however, provides for rescission only in the event that SSG did not close on the sale within two years from the date the interim escrow closed. It does not provide for rescission should SSG wrongfully lease FF & E.
 
 
 29
 C. Summary Judgment as to SSG on Closing Fraud Claims
 
 
 30
 The District Court granted summary judgment in favor of SSG on the Becherer plaintiffs' claim that SSG defrauded them by closing prematurely. Claims for fraudulent misrepresentation or concealment of a material fact are actionable in Florida. Department of Transp. v. Southern Bell Tel., 635 So.2d 74, 78 (Fla.Dist.Ct.App.1994). An essential element of such a claim, however, is that the party alleging fraud must have suffered injury as a result of relying on the misrepresentation. Id.
 
 
 31
 Here, the District Court found that the Becherer plaintiffs suffered no monetary damages as a result of the premature closing, a finding that has not been challenged on appeal. The Becherer plaintiffs, however, argue that they were injured because they suffered the deprivation of a legal right. According to the Becherer plaintiffs, if they had known that the hotel was not substantially complete at the time of the closing, they would have taken legal action to prevent the closing or cancel their subscriptions. Thus, they contend that the fraud prevented them from exercising their legal rights.
 
 
 32
 This argument cannot succeed; it is far from clear that the Becherer plaintiffs could have bettered their position by preventing the closing or that they could have withdrawn from their agreements with SSG. SSG was entitled to further time under the contract. Postponing or preventing the closing would have only delayed the opening of the hotel. As defendants point out, the winter months are crucial to the Florida resort hotel business. By opening early, perhaps prematurely, SSG was nevertheless able to bring in money by renting rooms and hosting conventions. The hotel is making money.
 
 
 33
 The Becherer plaintiffs have not presented evidence of an injury sufficient to allow them to proceed on their fraud claims against SSG arising out of the premature closing. Accordingly, the District Court did not err in disposing of these claims.
 
 
 34
 D. Summary Judgment as to Merrill Lynch on Closing Fraud Claim
 
 
 35
 The Becherer plaintiffs accuse Merrill Lynch of violating its responsibilities under 17 C.F.R. Secs. 240.10b-9[4] and 240.15c2-4[5] in two respects. First, they allege that Merrill Lynch closed the interim escrow account despite the fact that the offering was not fully subscribed until April 1985. Second, the Becherer plaintiffs allege that Merrill Lynch permitted the sale closing to occur and accepted the balance of its fee despite knowing that the hotel was not substantially complete.
 
 
 36
 In addressing these claims, the District Court focused on the latter claim and found that
 
 
 37
 Rules 10b-9 and 15c2-4 protect investors' funds when securities are sold subject to a minimum sales condition. Merrill Lynch satisfied these rules on February 15, 1985, when the minimum sales conditions were met and the escrow was closed, thus irrevocably binding the investors. The conduct that plaintiff class[6] claims violated these rules occurred at or near the October 31, 1986 closing of title. Rule 10b-9 and 15c2-4 do not apply to Merrill Lynch's conduct, which occurred after the February 15, 1985 closing of escrow. Thus, plaintiff class' Rule 10b-9 and 15c2-4 fraud claim must be dismissed....
 
 
 38
 Becherer, 799 F.Supp. at 770.
 
 
 39
 Before discussing the Becherer plaintiffs' arguments, we need to review some of the background underlying this case. Two relevant escrow accounts existed in this case. The first one is often referred to as the "interim escrow account." Merrill Lynch acted as agent for this account. Merrill Lynch closed the offering and the interim escrow account after the minimum subscription level was met and TMC approved the investors for financing. The contents of the interim escrow account were then transferred into the closing escrow account. Midwest served as escrow agent for this second escrow account. In the PPM, Merrill Lynch specifically disclaimed any responsibilities for supervising the status of the completion of the hotel: "Neither Selling Agent nor any of its affiliates has undertaken to Investors to monitor construction of the Hotel or to inspect the Hotel upon its completion."
 
 
 40
 The Becherer plaintiffs present three reasons to support their contention that the District Court erred in dismissing their fraud claims against Merrill Lynch. First, they claim that the District Court's own findings of fact state that the minimum subscription level was not attained until April 1985, almost two months after the closing of the interim escrow account.
 
 
 41
 Although the Becherer plaintiffs have not identified the findings of fact to which they refer, we assume they are referring to the findings in the District Court's August 7, 1992 order. In those factual findings, the District Court does state that "[b]etween February, 1984, and April, 1985, plaintiff class entered into contracts with SSG for the purchase of Hotel Units in The Registry Hotel...." Becherer, 799 F.Supp. at 762. Later on in his factual findings, however, the district judge declared, "I find that investors became 'irrevocably bound' to complete their purchases on February 15, 1985, the day their funds were delivered into escrow...." Id. at 763. This latter finding would seem to imply that the offering was sufficiently subscribed on February 15, 1985, when the interim escrow account was closed.
 
 
 42
 While it can be argued that these findings are in conflict, they can also be reconciled. It is conceivable that the offering was sufficiently subscribed at the time the interim escrow account was closed, but that investors were allowed to back out after that date. Merrill Lynch then found substitute investors, which could explain why the District Court found that investors executed Unit Sale Agreements as late as April 1985.
 
 
 43
 It is also conceivable that the "minimum subscription level" was something less than 100%. The parties have not defined that term for us, and we decline to hunt through the thousands of pages that comprise the record in this case. If "minimum subscription level" does not mean "fully subscribed," then it is possible that new investors could have been accepted after the closing of the interim escrow account.
 
 
 44
 Because the Becherer plaintiffs have raised this issue on appeal, they bear the burden of establishing that such explanations are clearly erroneous. Contrary to the Becherer plaintiffs' assertions, the District Court never made an explicit finding about when the minimum subscription level was reached. The Becherer plaintiffs have not directed our attention to any evidence that addresses this issue, nor have they said why the above reconciliation of the District Court's findings is not supported by the record.
 
 
 45
 In their second argument, the Becherer plaintiffs allege that the District Court erroneously concluded that Rules 10b-9 and 15c2-4 apply only to a minimum sales condition. This argument misconstrues both the facts of this case and the context of the District Court's opinion. While the District Court did state that "Rules 10b-9 and 15c2-4 protect investors' funds when securities are sold subject to a minimum sales condition," put in context it is clear that the District Court was actually holding that the securities regulations apply to the interim escrow account and not to the closing escrow account. This interpretation is consistent with the plain language of the regulations, and the Becherer plaintiffs have provided us with no reasons and no authority to find that this interpretation is erroneous.
 
 
 46
 In their third argument, the Becherer plaintiffs contend that Merrill Lynch kept itself informed about the progress of the hotel construction and that it accepted its fees and allowed the premature closing to occur despite knowing that the closing conditions had not been met. Whether or not Merrill Lynch kept informed about the hotel progress is irrelevant. What is important is whether Merrill Lynch represented to the investors at any time that Merrill Lynch was assuming responsibility for monitoring the construction progress. As we stated earlier, Merrill Lynch specifically disclaimed this responsibility in the PPM. The Becherer plaintiffs have not pointed us to any contrary evidence.
 
 
 47
 We affirm the District Court's decision to dismiss the Becherer plaintiffs' securities claims against Merrill Lynch.
 
 V.
 Issues Regarding FF & E Claims
 A. Finding of Breach Regarding FF & E
 
 48
 As one of their myriad claims against SSG, plaintiffs accuse SSG of unlawfully decreasing the value of their investment by leasing various furnishings, fixtures, and equipment for the hotel. According to plaintiffs, SSG was to have leased only a telephone and a television set for each hotel unit. Plaintiffs assert that SSG had promised to purchase the balance of the FF & E and provide it to the investors as part of substantially completing the hotel prior to the closing.
 
 
 49
 The District Court certified a class action on the contract actions against SSG and found, as a matter of law, that SSG had breached its contractual obligation to fully furnish the hotel. On appeal, SSG contends that this conclusion is in error. According to SSG, the contract documents provided it with authority to lease in its prudent judgment and provided that the lease expenses would be a hotel operating expense. SSG also argues that it was understood from the beginning that SSG would lease a telephone and a television for each unit, as well as FF & E for the common areas that were normally leased in the hotel industry.
 
 
 50
 The PPM informed the investors that "SHELTER SEAGATE CORPORATION ... offers for sale 474 Hotel Interests, each consisting of a fully furnished nonresidential resort hotel unit of The Registry Hotel at Pelican Bay...." The dispute over FF & E essentially boils down to an interpretation of the phrase "fully furnished." We find no error with the district court's decision and therefore affirm both the finding of a breach and the award of damages.
 
 
 51
 B. Dismissal of FF & E Fraud Claim against SSG and Merrill Lynch
 
 
 52
 In addition to their breach of contract claims regarding the leasing of the disputed FF & E, the Becherer plaintiffs also brought fraud claims against SSG and Merrill Lynch arising out of the same decisions. Because it had already awarded the Becherer plaintiffs damages on the breach of contract claims, the District Court dismissed the fraud claims. According to the District Court, to do otherwise would amount to a double recovery.
 
 
 53
 The Becherer plaintiffs argue that the District Court erred in dismissing their FF & E fraud claims because the dismissal prevented them from pursuing judgments against all potential joint and severally liable parties. The Becherer plaintiffs also argue that the measure of damages would have been different under tort and under contract.
 
 
 54
 We do not find these arguments persuasive. SSG injured plaintiffs by leasing various FF & E that it should have provided. The District Court awarded damages to plaintiffs under a breach of contract theory and found that these damages make plaintiffs whole. Plaintiffs, therefore, are not entitled to recover under any tort theory, as that would result in a windfall to plaintiffs. In addition, plaintiffs have not provided any evidence of bad faith, as is necessary to support a fraud claim.
 
 C. Piercing the Corporate Veil
 
 55
 In awarding damages against SSG for leasing the FF & E, the District Court also pierced the corporate veil and held three of SSG's officers and two of SSG's affiliate corporations secondarily liable for the breach. In reaching this decision, the District Court relied primarily on two factors: that SSG was thinly capitalized and that the various documents advertising the offering put great emphasis on the expertise of SSG's parent corporations and their owners. SSG argues that this decision was erroneous.
 
 
 56
 As is true in most jurisdictions, Florida law holds that courts should generally be reluctant to pierce the corporate veil. Acquisition Corp. of America v. American Cast Iron Pipe Co., 543 So.2d 878, 882 (Fla.Dist.Ct.App.1989). Unlike some other jurisdictions, Florida has severely limited the circumstances in which courts can take such an action. Under Florida law,
 
 
 57
 [t]he corporate veil may not be pierced unless it is shown not only that one business entity dominated or was the alter ego of the other, but that the relationship was created or used in order to mislead or defraud creditors.... To make that determination the court may address the broader question of whether there was evidence of improper conduct on the part of the corporate entity or the individual in the formation or operation of the corporation.
 
 
 58
 Id. at 881-82. See also Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114 (Fla.1984).
 
 
 59
 SSG did not conceal its thin capitalization from investors, nor did it defraud or mislead its investors regarding this fact. Thus, this ground does not provide a basis for piercing the corporate veil.
 
 
 60
 The District Court also set out at length various quotations from documents discussing the expertise of Can-American, Can-American Realty, and the stockholders of those corporations in the development, construction, and operation of multi-family dwellings. One quotation was drawn from the PPM:
 
 
 61
 The Shelter Group of companies include Shelter Seagate Corporation's parent, Can-American Realty Corporation, and its parent, Can-American Corporation. Through various subsidiaries and related companies, the group is owned by Graham C. Lount, Garrett G. Carlson and Arni Thorsteinson. The group is engaged in the acquisition, development and syndication of residential and commercial properties in the United States and Canada, including the development (but not operation) of hotels in both countries.
 
 
 62
 Becherer, 799 F.Supp. at 789. Four other quotations were drawn from the Merrill Lynch Marketing Guide. We set out the first three of these quotations seriatim:
 
 
 63
 Shelter Seagate Corp., ("SSG"), is a newly formed corporation, organized for the purpose of developing The Registry Hotel at Pelican Bay. SSG is a wholly owned subsidiary of Can-American Realty Corp., and through a number of holding companies, Can-American Realty Corp., is ultimately owned by Graham C. Lount, Garrett G. Carlson, and Arni Thorsteinson. The audited net worth of Can-American is $18,000,000. Fair market net worth is in excess of $50,000,000. Total assets are in excess of $350,000,000.
 
 
 64
 ....
 
 
 65
 In addition, Can-American is currently developing three additional properties in Naples and Pelican Bay besides The Registry:
 
 
 66
 ....
 
 
 67
 The management of SSG, Gary Carlson, Graham Lount, and Arni Thorsteinson, bring to the project substantial development expertise. They have been actively engaged in the design, construction, financing, development and management of over 18,000 units of multi-family housing in the U.S. and Canada.
 
 
 68
 Id. at 790.
 
 
 69
 The final quotation, as we said earlier, is also drawn from the Marketing Guide. It is from the section entitled "Objections Clinic," and apparently provides advice to agents for responding to various possible questions by investors:
 
 
 70
 Q. The start-up of a new venture is terrifying to me. Too much can go wrong. I want no part of being a trailblazer.
 
 
 71
 A. So was my first date. Seriously, nothing ventured; nothing gained. We have an experienced Developer, acquainted with the area, already developing property in the area; granted, not Hotel property, but still a Developer able to complete deals in Pelican Bay. And we have a proven "par excellence" Hotel Manager in The Registry Hotel Corp. Also remember, the Developer is taking all the construction risks. There are risks in this venture, but you, the Investor, are "in bed" with some very classy partners.
 
 
 72
 Id.
 
 
 73
 On the basis of these quotations, the District Court concluded that
 
 
 74
 Can-American Corporation, Can-American Realty Corporation, Garrett G. Carlson, Graham C. Lount, and Arni Thorsteinson held themselves out to investors as the developer of The Registry Hotel, capable of fulfilling Shelter Seagate Corporation's contractual obligations.
 
 
 75
 Id.
 
 
 76
 The only quotations that could support this conclusion are second and fourth ones drawn from the Merrill Lynch Marketing Guide. Merrill Lynch developed this Guide for in-house use only; it was not to be distributed to investors. In issuing its factual findings on this issue, the District Court made no findings as to whether any investors received or relied on this Guide. Id. at 789-90. Moreover, plaintiffs have pointed to no evidence that SSG was involved in the drafting of this Guide or that SSG approved any disbursement of the Guide to investors. Accordingly, there is no evidence that SSG, its affiliates, or shareholders misled or defrauded plaintiffs. The District Court erred in piercing the corporate veil. We therefore reverse the District Court on this issue.
 
 VI.
 Issues Regarding Miscellaneous Claims
 
 77
 A. Summary Judgment on Plaintiffs' Projections Claim
 
 
 78
 The Becherer plaintiffs accuse Merrill Lynch of providing materially false and misleading projections in the PPM. Specifically, they attack the alleged failure to disclose the construction of a nearby Ritz-Carlton hotel and the alleged promise that all FF & E would be purchased, not leased. On November 19, 1990, the District Court granted summary judgment in favor of Merrill Lynch on this claim.
 
 
 79
 The District Court has adequately and correctly addressed all the arguments that the Becherer plaintiffs raise on appeal with respect to the Ritz-Carlton. Accordingly, we affirm the District Court on that issue for the reasons stated in its opinion. Becherer, 799 F.Supp. at 781-84.
 
 
 80
 The District Court did not, however, directly address the Becherer plaintiffs' claims regarding the FF & E projections. A review of the record explains why. The Becherer plaintiffs did not provide any evidence to support this claim until June 25, 1992, in connection with a motion for reconsideration of the court's November 19, 1990 order and a motion for summary judgment on other issues. The affidavits relied upon by the Becherer plaintiffs, both below and on appeal, were not filed with the District Court until the morning of the scheduled hearing on their motions. The District Court refused to consider these affidavits, essentially holding that they were untimely filed. The Becherer plaintiffs have not provided any explanation for the tardy filing.[7] Thus, the District Court did not abuse its discretion in refusing to consider the affidavits. Without that evidence, the Becherer plaintiffs have not fulfilled their burden of proof, and the District Court's grant of summary judgment on this issue was proper.
 
 
 81
 B. Breach of Interim Escrow Duties by Merrill Lynch
 
 
 82
 The Becherer plaintiffs argue that Merrill Lynch breached its duties as interim escrow agent by allowing that escrow to close without disclosing the following information to investors:
 
 
 83
 1) the minimum subscription level was not met at the time of the interim escrow closing;
 
 
 84
 2) SSG intended to lease FF & E;
 
 
 85
 3) the financial projections provided to investors did not factor in the cost of leasing the FF & E; and
 
 
 86
 4) TMC never provided notice of financing approval to investors.
 
 
 87
 All four allegations can be disposed of easily. First, the District Court found that investors became bound to complete their purchases on February 15, 1985. This finding contains an implicit conclusion that the minimum subscription level was met at the time of the interim escrow closing. The Becherer plaintiffs point to no information that would allow us to find that this conclusion was clearly erroneous. Thus, we will not overturn it on appeal.
 
 
 88
 Second, we have reviewed the District Court's opinions in this case and find no discussion of when Merrill Lynch learned of SSG's intention to lease the disputed FF & E and whether Merrill Lynch thought that intention contravened the contract. Nor have the Becherer plaintiffs pointed to any part of the record to show they raised this argument below. We will not address it for the first time on appeal. Merrill Lynch points to evidence that it reduced its commission so that the project could be completed as promised and that it believed that, with these concessions, SSG could fulfill its end of the contract.
 
 
 89
 We earlier addressed the Becherer plaintiffs' allegations regarding Merrill Lynch's projections and SSG's decision to lease FF & E. We will not repeat that discussion here, except to say the claim has no merit.
 
 
 90
 Finally, the District Court specifically found that "plaintiffs waived their right to be notified of financing approval by not objecting to the lack of notice of such approval within a reasonable time period after they received notice of the escrow closing." Becherer, 799 F.Supp. at 789. The Becherer plaintiffs have provided no reasons why this conclusion was in error, and we will thus not overturn it on appeal.
 
 C. Land Sales Act
 
 91
 As part of their complaint, the Becherer plaintiffs raised a claim under the Land Sales Act, 15 U.S.C. Sec. 1701 et seq. This statute makes it unlawful for any developer or agent to defraud or deceive a purchaser with respect to the sale of a non-exempt lot. The initial dispute in this case is whether the hotel units marketed by Merrill Lynch are exempt from the requirements of the Act.
 
 
 92
 The Act provides an exemption for, among other things, "the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years...." 15 U.S.C. Sec. 1702(a)(2). The District Court found that the two-year period started running on February 15, 1985, with the closing of the interim escrow account, as it was only then that the parties became legally bound under the Unit Sale Agreements. Because the plain language of the Unit Sale Agreements required SSG to erect the hotel within two years of that date, the District Court found that this transaction was exempt from the terms of the Land Sales Act.
 
 
 93
 On appeal, the Becherer plaintiffs argue that this conclusion was in error. According to them, the two-year time period began running from when the first investor signed a Unit Sales Agreement in February 1984. To support this interpretation, they refer to a HUD regulation, 24 C.F.R. Sec. 1710.5(b), discussing exemptions from the Land Sales Act.
 
 
 94
 This argument cannot succeed. First, there is substantial doubt about whether this regulation applies to the present transaction. The language on which the Becherer plaintiffs rely was added as part of an August 6, 1984 amendment. It is not clear whether this amendment is retroactive. Second, even if the amended regulation applies, it speaks of presale clauses that are "legally binding." As the District Court found, none of the parties to the present transaction became legally bound until the closing of the interim escrow account on February 15, 1985.
 
 
 95
 Although the District Court reached the correct result on the "two year" question, it incorrectly thought that the analysis stopped there. It is not enough to find that the contract requires completion of the hotel in two years. Under the terms of the statute, the contract must "obligate" the developer to complete construction in two years. According to the Becherer plaintiffs, SSG was not "obligated" to build the hotel, as the Unit Sale Agreements contain a clause limiting possible remedies for a breach by excluding the possibility of damages.
 
 
 96
 While the statute does not elaborate on the meaning of "obligation," the regulations do. In the Code of Federal Regulations, HUD discusses possible contractual limitations on buyers' remedies:
 
 
 97
 HUD's interpretation of what constitutes a two-year obligation to construct a building relies on general principles of contract law in deciding whether or not the seller has, in fact, an obligation to erect a building within two years. Provisions for purchaser financing and remedies clauses are matters to be decided by the parties to the contract under the laws of the jurisdiction in which the construction project is located.
 
 
 98
 However, the contract must not allow nonperformance by the seller at the seller's discretion. Contracts that permit the seller to breach virtually at will are viewed as unenforceable because the construction obligation is not an obligation in reality.
 
 
 99
 . . . . .
 
 
 100
 24 C.F.R. Pt. 1710, App. A, subpt. IV(b). As part of this subsection, HUD also notes that state law may affect the outcome of various cases under this statute:
 
 
 101
 Because of the variations in applicable contract law among the states and the many different provisions that are used by sellers in construction contracts, HUD may condition its advisory opinions under this exemption on representations by local counsel as to the current status of state law on the relevant issues. For example, in the Florida case of Dorchester Development, Inc. v. Tema Burk, Schwartz & Nash, 439 So.2d 1032 [Fla.Ct.App.1983], the court held that there must be an unconditional commitment to complete the condominium units within two years and that the remedies available to the purchaser must not be limited. Although the opinion's language was broad, it is HUD's position that the court's concern regarding limitations on remedies was confined to the right to specific performance. However, developers, especially those in Florida, should be aware of this decision and how it may be treated by higher Florida courts, as well as courts in other jurisdictions.
 
 
 102
 Id. It is thus apparent that the meaning of "obligation" is tied to the relevant state contract law.
 
 
 103
 As we have stated before, Florida provides the relevant state law for interpreting the contract at issue. Since the promulgation of the above-quoted regulations, the Florida Supreme Court has directly addressed this question and ruled that no contractual "obligation" exists unless the contract provides for the possibility of damages. Samara Dev. Corp. v. Marlow, 556 So.2d 1097, 1101 (Fla.1990). A contract that provides only for the possibility of rescission or specific performance is not sufficient. Id.
 
 
 104
 In the case at bar, section 8 of the Unit Sale Agreement provides:
 
 
 105
 Seller shall be in default hereunder if Seller fails to close the sale pursuant to Section 5 within two years after the date this Agreement becomes binding on Purchaser.... Purchaser's remedy against Seller for Seller's default hereunder shall be either to obtain a refund of all deposits made pursuant hereto ... or to seek specific performance of this Agreement, at the Purchaser's election.
 
 
 106
 U.S.A. Sec. 8 (emphasis added). Thus, it would appear that the express language of the contract does not allow for the possibility of damages. Neither the parties nor the District Court, however, have provided us with any guidance as to whether Florida law would read a damages remedy into such a contract. In other words, if specific performance is impossible and is the primary contractual remedy, will Florida nevertheless award damages to the injured party? Because the parties have not focused on this question, they have supplied us with no guidance, and we are reluctant to address it. Accordingly, we remand this issue to the District Court.
 
 
 107
 In addition, this exemption is not the only one available. Merrill Lynch also argues that the Land Sales Act does not apply to the instant transaction because the hotel interests are not "lots" under the Act, as investors do not have exclusive use of their units. We decline to reach this argument as it is not entirely clear just what plaintiffs were purchasing. We believe the issue should be addressed in the first instance by the District Court upon remand.
 
 D. Dismissal of Claims Against TMC
 
 108
 Included in the Becherer plaintiffs' complaint were numerous claims against TMC, the financial institution responsible for approving investors for loans. The District Court dismissed all these claims, as it found they were barred by the D'Oench Duhme doctrine. See D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The District Court has adequately and correctly addressed all the arguments raised by the Becherer plaintiffs on appeal of this issue. Accordingly, we affirm the District Court for the reasons stated in its opinion. Becherer, 799 F.Supp. at 772-75.
 
 E. Dismissal of Midwest
 
 109
 The Becherer plaintiffs filed their original complaint on August 21, 1989. Between that date and December 17, 1990, the parties actively pursued this litigation, taking depositions and filing numerous motions seeking both discovery and dismissal of various claims. On December 17, 1990, the District Court issued an order requiring the Becherer plaintiffs to file an amended complaint, but limited the amendment to possible breach of contract claims against the defendants.[8]
 
 
 110
 On February 1, 1991, the Becherer plaintiffs filed their amended complaint. This complaint, however, was not limited to breach of contract actions against the then-existing defendants. Rather, the Becherer plaintiffs added a new party, Midwest, and raised breach of contract actions against Midwest for its part in the premature sale closing. On April 3, 1991, Midwest filed a motion to be dismissed as a misjoined party.
 
 
 111
 Due to various delays apparently connected with the proposed settlement proceedings, the District Court did not rule on this motion until August 7, 1992. On that date, as part of an omnibus opinion and order, the District Court granted Midwest's motion to dismiss, stating:
 
 
 112
 Plaintiff class[9] added Midwest to their amended complaint in violation of FRCP 15(a); without leave of this court as required by FRCP 21; and in contravention to my January 7, 1991 Order. Furthermore, they knew as early as April, 1991 that Midwest objected to being added as a defendant, yet took no corrective action until May, 1992. At this stage of the litigation it would simply be unjust to add Midwest as a defendant. This case is nearly three years old, and the paperwork submitted thus far has surely decimated a small forest. Nothing suggests the claim against Midwest is newly discovered; indeed, an escrow closing is a normal part of any real estate transaction. Last, the claims against Midwest, if any remain viable after this Opinion, are discrete and severable.
 
 
 113
 Becherer, 799 F.Supp. at 775. The District Court dismissed the claim without prejudice.
 
 
 114
 The Becherer plaintiffs argue that this decision was in error. In support of this argument, they first contend that, under Fed.R.Civ.P. 15(a), they are allowed to amend as a matter of course as to defendants who have not yet filed a responsive pleading. According to the Becherer plaintiffs, as of February 1, 1991, Midwest had not filed a responsive pleading, so the Becherer plaintiffs could add them without prior court permission.
 
 
 115
 This argument is specious. Midwest was not a party to the suit before the Becherer plaintiffs filed their amended complaint. If we accept this interpretation of Rule 15(a), a plaintiff could always add a new party, at any point in the litigation, without court permission.
 
 
 116
 The Becherer plaintiffs also attempt to refute the rest of the District Court's reasons by arguing that they did not unduly delay in responding to Midwest's motion to dismiss, that adding Midwest did not prejudice Midwest, and that the joinder served judicial economy. The Becherer plaintiffs argue that Midwest was present at almost all proceedings after it was joined as a party, and thus would not have been prejudiced.
 
 
 117
 We first note, as did the District Court, that the Becherer plaintiffs joined Midwest as a party without seeking prior court permission, as is required under either Rules 15(a) or 21. If they had been denied such permission, we would review the denial for an abuse of discretion. Thus, it logically follows that we use the same standard in reviewing the district judge's decision to dismiss Midwest.
 
 
 118
 We find that the District Court did not abuse its discretion. The claims against Midwest are related to, but easily divisible from, the claims against the other defendants. The District Court also explicitly found that allowing the Becherer plaintiffs to add Midwest would be prejudicial to Midwest. As the Ninth Circuit has stated, "[a]mending a complaint to add a party poses an especially acute threat of prejudice to the entering party." DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 187 (9th Cir.1987). Accordingly, the major objective of courts faced with this situation should be to avoid prejudice to the party to be added. Id.
 
 
 119
 The Becherer plaintiffs argue that Midwest would not be prejudiced because its attorneys attended almost every proceeding after it was added. This is not, however, the proper inquiry. Instead, our focus should be on the degree to which Midwest took an active role in the litigation and whether its attorneys were simply observers or whether they actually invested substantial amounts of time in preparing Midwest's case. Simply acting as an observer and monitor would not have prepared Midwest to jump into complicated commercial litigation at this late stage in the proceedings. The District Court was in the best position to make this determination, and it found that Midwest would be prejudiced if it were not dismissed. The Becherer plaintiffs have presented us with no reason to conclude that this was an abuse of discretion.
 
 VII.
 Injunction Against Florida Plaintiffs
 
 120
 The District Court enjoined the Florida plaintiffs from pursuing further litigation or arbitration against all defendants as to issues actually decided by the District Court. The Florida and Becherer plaintiffs challenge this ruling on appeal.
 
 
 121
 While plaintiffs argue at length that the injunction was improper because putative class members cannot be bound absent notice and an opportunity to opt out, this focus fails to recognize that the District Court's ruling was premised on the concepts of res judicata and collateral estoppel, which are separate and independent of class certification. If either of those doctrines is applicable, the formalities of class certification are irrelevant.
 
 
 122
 As the District Court recognized, both res judicata and collateral estoppel can be used to bind a nonparty only if the nonparty was "in privity" with a party to the prior action. A nonparty will be considered in privity, or sufficiently close to a party in the prior suit so as to justify preclusion, in three situations:First, a non-party who has succeeded to a party's interest in property is bound by any prior judgments against the party.... Second, a non-party who controlled the original suit will be bound by the resulting judgment.... Third, federal courts will bind a non-party whose interests were represented adequately by a party in the original suit.
 
 
 123
 Southwest Airlines Co. v. Texas Int'l Airlines, 546 F.2d 84, 95 (5th Cir.1977) (citations omitted). The first situation is inapplicable here. The District Court glossed over the second scenario and focused on the third issue: adequate representation.
 
 
 124
 The doctrine of adequate representation is also known as virtual representation. This concept has been developed primarily by the Fifth Circuit. 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure Sec. 4457 (1981). In the words of the Fifth Circuit, the doctrine of virtual representation
 
 
 125
 requires more than a showing of parallel interest or, even, a use of the same attorney in both suits.... The question of virtual representation is one of fact and is to be kept within "strict confines." ... Virtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues.
 
 
 126
 Benson and Ford, Inc. v. Wanda Petroleum Co., 833 F.2d 1172, 1175 (5th Cir.1987) (citations omitted). A leading treatise also agrees with the need to keep the doctrine within strict confines:
 
 
 127
 Some decisions and commentaries have begun to develop a theory of nonparty preclusion that is often identified as "virtual representation." The broadest form of this theory would preclude relitigation of any issue that had once been adequately tried by a person sharing a substantial identity of interest with a nonparty. Justification for this result is found in the general theory of representation. Adoption of the theory in this form could expand nonparty preclusion far beyond current practice. If one of fifty persons injured in a bus accident should lose an action against the bus company, for example, all of the other passengers could be bound by any adverse findings. Actual use of virtual representation theory has not yet begun to approach such expansive consequences, and it does not seem either desirable or likely that it will carry so far.
 
 
 128
 ....
 
 
 129
 A narrow role may remain for virtual representation, so long as adequate litigation remains the central requirement. Some cases may present substantial elements of several different grounds of nonparty preclusion, without clearly justifying application of any one ground. Careful application of the virtual representation label may provide a convenient means of aggregating these separate elements in special circumstances that make relitigation especially unattractive.... Close nonlitigating relationships with a party, participation, apparent acquiescence, and perhaps deliberate maneuvering to avoid the effects of the first action are among the factors to be weighed.
 
 
 130
 . . . . .
 
 
 131
 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure Sec. 4457 (1981). A review of the case law reveals that courts will refuse to apply virtual representation simply to preclude a nonparty from relitigating issues that have been lost after vigorous advocacy by a party who seems to hold an interest identical to the interests of the nonparty. Id.
 
 
 132
 In support of its finding that the Florida plaintiffs were adequately represented by the Becherer plaintiffs, the District Court declared:
 
 
 133
 The relationship between Florida plaintiffs and the named plaintiffs is "sufficiently close" to support a finding of privity. Both are in the group of investors that purchased units in The Registry Hotel. Both have the same interest in the case, i.e., both were identically situated and both raise the same causes of action.
 
 
 134
 Becherer v. Merrill Lynch, 809 F.Supp. 1259, 1268-69 (E.D.Mich.1992). As these words illustrate, the District Court used an impermissibly broad definition of adequate or "virtual" representation.
 
 
 135
 Accordingly, we must reverse the District Court's finding of privity and vacate its ensuing injunction. The briefs submitted by the parties on appeal, however, demonstrate a strong possibility that this case may yet be an appropriate one for the application of res judicata and collateral estoppel. Merrill Lynch contends that the Florida plaintiffs, through the Association of Unit Owners, authorized, financed, and controlled the investigation and prosecution of the Becherer plaintiffs' suit, including hiring an attorney and arranging to pay him a combination retainer and contingency fee.
 
 
 136
 Because many of the facts discussed in the briefs are in dispute and because the issue was not fully developed and is essentially factual, we are unable to decide it here. Instead we remand the case to the District Court for factual findings under the narrower theory of virtual representation articulated above.
 
 VIII.
 
 137
 Miscellaneous Issues Raised by Florida Plaintiffs
 
 
 138
 The Florida plaintiffs also complain of the procedures used by the District Court in facilitating the proposed, but rejected, settlement. As the settlement failed, no relief is necessary or available. Accordingly, these issues are moot and we decline to address them.
 
 IX.
 
 139
 We AFFIRM the portion of the District Court's opinion finding that SSG breached its contract by prematurely leasing FF & E, but REVERSE the District Court's decision to pierce the corporate veil and hold Can-American Corporation, Can-American Realty Corporation, and their three shareholders secondarily liable for SSG's breach of contract regarding the premature lease of FF & E.
 
 
 140
 We REVERSE the District Court's ruling that this transaction is exempt from the requirements of the Land Sales Act under 15 U.S.C. Sec. 1702(a)(2). We REMAND this issue for further proceedings consistent with this opinion.
 
 
 141
 We REVERSE the District Court's finding of adequate representation and VACATE the ensuing injunction. We REMAND this issue for factual findings under the narrower version of virtual representation articulated above.
 
 
 142
 In all other respects, we AFFIRM the rulings of the District Court.
 
 
 
 [1]
 The District Court also later certified a conditional class action for purposes of settlement, but the settlement collapsed, vitiating the class certification
 
 
 [2]
 These are the same conditions for the closing of the interim escrow account
 
 
 [3]
 Rule 16 provides:
 (a) Pretrial Conferences; Objectives. In any action, the court may in its discretion direct the attorneys for the parties and any unrepresented parties to appear before it for a conference or conferences before trial for such purposes as
 (1) expediting the disposition of the action;
 (2) establishing early and continuing control so that the case will not be protracted because of lack of management;
 (3) discouraging wasteful pretrial activities;
 (4) improving the quality of the trial through more thorough preparation, and;
 (5) facilitating the settlement of the case.
 Fed.R.Civ.P. 16.
 
 
 [4]
 Rule 10b-9(a) provides:
 It shall constitute a manipulative or deception device or contrivance, as used in section 10(b) of the Act, for any person, directly or indirectly, in connection with the offer or sale of any security, to make any representation:
 (1) To the effect that the security is being offered or sold on an "all-or-none" basis, unless the security is part of an offering or distribution being made on the condition that all or a specified amount of the consideration paid for such security will be promptly refunded to the purchaser unless (i) all of the securities being offered are sold at a specified price within a specified time, and (ii) the total amount due to the seller is received by him by a specified date; or
 (2) To the effect that the security is being offered or sold on any other basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not sold, unless the security is part of an offering or distribution being made on the condition that all or a specified part of the consideration paid for such security will be promptly refunded to the purchaser unless (i) a specified number of units of the security are sold at a specified price within a specified time, and (ii) the total amount due to the seller is received by him by a specified date.
 
 
 [5]
 Rule 15c2-4 provides:
 It shall constitute a "fraudulent, deceptive, or manipulative act or practice" as used in section 15(c)(2) of the Act, for any broker, dealer or municipal securities dealer participating in any distribution of securities, other than a firm-commitment underwriting, to accept any part of the sale price of any security being distributed unless:
 (a) The money or other consideration received is promptly transmitted to the persons entitled thereto; or
 (b) If the distribution is being made on an "all-or-none" basis, or on any other basis which contemplates that payment is not to be made to the person on whose behalf the distribution is being made until some further event or contingency occurs, (1) the money or other consideration received is promptly deposited in a separate bank account, as agent or trustee for the persons who have the beneficial interests therein, until the appropriate event or contingency has occurred, and then the funds are promptly transmitted or returned to the persons entitled thereto....
 
 
 [6]
 Despite the fact that the District Court speaks of a "plaintiff class" here, no such class was certified as to this issue
 
 
 [7]
 We also note that the Becherer plaintiffs did not even allege that the District Court erred in refusing to admit these affidavits until their reply brief. Ordinarily, we will not consider assignments of error raised so late in the appeal process
 
 
 [8]
 The District Court later amended this order, but the amended order changed only the dates for filing
 
 
 [9]
 Again, it appears that the District Court used this phrase without ever certifying a plaintiff class on this issue. Accordingly, we read this language only to mean the Becherer plaintiffs